EDEN UNITED, INC., (Defendant, Cross–Defendant, Counter–Claimant and Cross–Claimant Below), and

Bankatlantic Financial Corporation f/k/a I.R.E. Financial Corporation (Defendant and Cross–Defendant Below), and

Eden Services, Inc., I.R.E. Properties, Inc., I.R.E. Investments Inc., and Investment Management Group, Inc., Appellants (Defendants Below),

v.

Frank M. SHORT, (Plaintiff and Counter–Defendant Below), and

Chatlee Realty Corp., (Defendant, Cross–Defendant, Counter–Claimant and Cross–Claimant Below), Appellees.

No. 49A02–8910–CV–504 [1].

Court of Appeals of Indiana, First District.

June 27, 1991.

Rehearing Denied Aug. 7, 1991.

1. This case was reassigned to this office on May 2, 1991.

Joe C. Emerson, James M. Matthews, Baker & Daniels, Indianapolis, for appellants.

Stephen R. Buschmann, B. Claire South, Buschmann, Carr & Shanks, P.C., G.R. Parish, Jr., Indianapolis, for appellees.

ROBERTSON, Judge.

Eden United Inc., Bankatlantic Financial Corp., successor of I.R.E. Financial Corp., and Eden Services, Inc., I.R.E. Properties, Inc., I.R.E. Investments, Inc., and Investment Management Group, Inc. appeal the judgments entered against them in favor of appellee, Frank M. Short, and counterclaimant, Chatlee Realty Corp., in an action brought by Short for breach of contract and tortious interference with a contractual relation and on Chatlee's counterclaim for breach of contract. Short cross-appeals the trial court's award of nominal damages on his tort claim against the defendants.

We affirm the judgments as to all the defendants but IMG and reverse the trial court's ruling on compensatory damages.

The record reflects that in early 1980, Bart Schuman, a real estate syndicator in Los Angeles, received a sales brochure from Scott Kranz, an individual representing himself to be Vice–President of the I.R.E. Group, offering Eastwind Village, an apartment complex in Indianapolis, Indiana, for sale. Schuman contacted appellee Short, a business associate with whom Schuman had consummated some fifteen real estate purchases, to act in effect as a banker for a proposed syndication of the property to a limited partnership to be created by Schuman. At Schuman's urging, Short contacted Kranz and after viewing the property concluded that Eastwind would be suitable for purchase and resale through syndication.

In May, 1981, having reached agreement with Kranz on the purchase price and structure of the deal, Short and Schuman met with Kranz and other representatives of the I.R.E. Group. Short learned for the first time that he would be buying the property from Eden, not the I.R.E. Group, that Kranz did not have the authority to commit Eden but an Alan Levan, President of Eden did, and that Eden did not yet own the property but was concurrently negotiating for its purchase from appellee Chatlee Realty Co. Kranz informed Short that they could agree to the same amount of dollars overall but needed a higher purchase price. This meant that $240,000 of agreed upon interest would be converted to principal. As an accommodation, Short agreed to this change, but insisted that all other payments due under the note be treated as interest. Eden agreed but the word "interest," which appeared at one point in a draft, was omitted from the final document.

A provision relating to the proration of real estate taxes was also negotiated and added but subsequently omitted. Short

caught this change and demanded that the parties' agreement on proration of taxes be put back in the document.

The parties discussed the terms of the Eden–Chatlee mortgage because it had been decided that Short's mortgage would "wrap" existing mortgages on the property. Since the terms of the other mortgages on the property were acceptable to Short and Eden insisted that the Eden–Chatlee mortgage had not yet been created, Short agreed that the Short–Eden mortgage would be no more stringent than the "underlying mortgages." In fact, the lengthy Eden–Chatlee documents had been negotiated in March, 1981, with terms varying considerably from those of the other mortgages presented to Short.

Short left the contracting session confident that he and Eden had reached agreement on the deal. After an inspection of the property, the parties amended the agreement to require Eden to obtain from Chatlee certain warranties concerning the property, among them, that Chatlee would maintain the property in the condition found by Short during the inspection and that Chatlee would close with Short under the terms of the Short–Eden agreement should Eden default and not close on the property.

During the months which followed, the transaction dragged. Eden delayed ordering the title work and postponed the closing. Fearing that the deal was slipping away, Schuman urged another meeting. On August 17, 1981, Short's group met again with Eden. At this meeting, Eden proposed a mortgage containing a due on sale clause, notice provisions, and grace periods which were more stringent than the mortgages reviewed by Short in May. Indeed, they were unworkable for Short who necessarily would have to meet the requirements of each mortgage "wrapped" by his mortgage to Eden and could not do so under the terms proposed. Eden agreed to make the changes requested by Short, including the addition of a collection agent to facilitate payment of the mortgages, and would prepare the closing documentation.

Short and his attorneys arrived in Miami on August 31, 1981, for the September 1 closing. Late that evening, Eden finally delivered the closing documents and Short's team stayed up until 3:00 a.m. reviewing them. The documents were presented exactly as they had been prior to the August 17 meeting. The amount of the note was correct but two interest payments of $150,000 had been converted to principal. The note was not prepayable, making Short's entire transaction with Schuman impossible. The note reflected the timing of the $240,000 in principal differently than Short had instructed. The mortgage contained no grace period on monthly payments and no requirement of notice if payment was late. Short assumed these matters would be resolved with additional drafting at the closing table. He proceeded to the closing financially ready to close the deal.

Short spent 5½ hours on September 1, 1981, with Eden trying to close. Eden refused to assign the warranties of condition obtained from Chatlee or negotiate any of the other issues until the closing statement, which called for an additional $133,000 in taxes, had been signed and accepted. The closing ended abruptly with Levan and his people walking out.

When Eden failed to meet the terms of its escrow arrangement with Chatlee and defaulted on that deal, Chatlee began working with Short to close on Eastwind. Chatlee reached agreement with Short on the financial terms and the changes were made to the Short–Chatlee mortgage which had been requested by Short in July. However, even though Chatlee and Short tried to close under the terms of the Short–Eden agreement, Eden blocked the escrowed Eden–Chatlee closing documents without justification, demanded compensation if Chatlee sold directly to Short, offered to allow Chatlee to sell to any purchaser except Short without interference and proposed alternative purchasers for brokerage fees far less than the sums demanded from a Short–Chatlee closing. Ultimately, both Chatlee and Short were forced to walk away from the deal.

In this appeal, the parties challenge the tort judgment in favor of Short in several respects. Eden and the other defendants, collectively referred to as the Eden defendants, argue: (1) that Eden was found to have tortiously interfered with its own contract, contrary to Indiana law; (2) that Short lacked standing to sue for tortious interference with contract; (3) that the evidence is insufficient on certain elements of the tort; and (4) that the evidence does not support an award of punitive damages. Short contests the award of nominal damages. He argues that the trial court applied an erroneous standard, requiring greater certainty of lost profits than Indiana law requires.

Eden also appeals the breach of contract judgments. Eden argues that neither the evidence nor findings are sufficient to permit the conclusion that Eden breached or repudiated the Short–Eden contract. Eden urges with respect to the judgment in favor of Chatlee. that it was obligated under the contracts to pay liquidated damages of $85,000 only one time, regardless of whether it breached both agreements.

The Eden defendants independently attack the determinations, that they were engaged in a joint venture with Eden and that as affiliated corporations they were in essence a single corporate instrumentality, by which they were found liable for the judgments against Eden.

■ The trial court made findings of fact and conclusions of law pursuant to Ind.Trial Rule 52(A). In our capacity as a reviewing court, we will not disturb those findings unless they are clearly erroneous. In making that determination, we do not reweigh evidence or reassess witness credibility. We consider only the evidence and reasonable inferences drawn therefrom that support the trial court's judgment. That judgment will not be altered unless, after a review of the entire record, we have a firm and definite conviction that a mistake has been made. *Johnson v. Hickman* (1987), Ind.App., 507 N.E.2d 1014, 1017, *trans. denied.* If there is evidence of probative value which will support the judgment, the decision of the trial court will be affirmed. *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.* (1987), Ind.App., 507 N.E.2d 588, 597.

## I.

### Tortious Interference with Contract Claim

■ Eden claims the trial court found that Eden tortiously interfered with Short's right, as a third-party beneficiary of the Eden–Chatlee contract, to close directly with Chatlee. Accordingly, Eden argues first, that it cannot tortiously interfere with its own contract and second, that a third-party beneficiary has no cause of action for tortious interference with a contract to which it was not a party. Eden also contends that the evidence and the trial court's findings are insufficient to show three of the tort's elements, namely, breach, causation and injury.

Our reading of the evidence and the trial court's findings and conclusions does not lead us to agree with Eden that Short was merely a third-party beneficiary of Eden's contract with Chatlee or perceived as such by the court. The trial court found that "[t]he Short–Eden Contract required Eden United ... to obtain a warranty that Chatlee would close directly with Short under the terms of the Short–Eden Contract if Eden United defaulted and did not close," that "Chatlee had contracted, understood and agreed to sell Eastwind to Short under the financial terms of the Short–Eden Contract if Eden United breached its contract," and concluded that "Short had a direct contractual right to close with Chatlee under the terms of the Short–Eden Contract." The evidence discloses that as a condition of purchase, Short required Eden to obtain from Chatlee an agreement to close directly with him, that Eden obtained the desired agreement from Chatlee in writing on May 13, 1981, and that Chatlee's representative, Arthur Unger, understood that Short wanted a direct sale from Chatlee should Eden default.

Short gave consideration to Eden for the right to performance by Chatlee. It was this property right acquired from Eden which Short alleges, and the trial court

found, the law protects from tortious interference by Eden. Thus, contrary to Eden's assertions, Short's right to close directly with Chatlee arose by reason of his own contract with Eden, not "solely by reason of his status as beneficiary of the Eden–Chatlee contract."

Eden cites only *Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad* (N.D.Ill., 1983), 579 F.Supp. 574 in support of its contention that a third-party beneficiary does not have standing to raise a tortious interference with contract claim. Inasmuch as we have concluded Short possessed an independent, enforceable contract right to close with Chatlee, *Organization of Minority Vendors* is inapposite.[2]

■ Eden's contention that the evidence and findings are inadequate because the trial court failed to find a breach of contract by Chatlee is also without merit. The trial court concluded that Chatlee and Short were unable to close because of Eden's tortious interference and that Eden's tortious interference constituted an excuse *from performance by Chatlee* of its contract with Short. Thus, the trial court's findings unequivocally reflect its determination that Chatlee failed to perform. While Indiana law requires proof that the defendant interfered with a valid and enforceable contract, no Indiana decision extends the concept of breach to proof of third party liability to the plaintiff for breach of contract. *See e.g. Miller v. Ortman* (1956), 235 Ind. 641, 136 N.E.2d 17. The Restatement (Second) of Torts § 766 would subject the interferer to liability if he induces or otherwise causes the other party "not to perform" without regard to

that party's ability to avoid liability for breach, reasoning that a contract is a valid and subsisting relation until it is avoided. Restatement § 766, comment f. *See also* 45 Am.Jur.2d Interference § 41 (Tort includes not merely procurement of breach but all invasions of contractual relations including any act which retards, makes more difficult, or prevents performance, or makes performance of contract less valuable to promisee); 84 A.L.R. 43. Accordingly, we view the element of breach satisfied by a finding of justified nonperformance.

■ Eden maintains that there was no evidence that any of the acts of interference found by the trial court bore a causal relationship to the failure of Short and Chatlee to close. Included in the "pattern of conduct" engaged in by Eden and cited by the trial court in its findings was Eden's blocking of the escrowed Eden–Chatlee closing documents without justification and Eden's offering to permit Chatlee to sell to any purchaser but Short.

Though the blocking of the escrowed documents appears only to have forestalled a Short–Chatlee closing, the reason Chatlee was unable to close with Short, according to Arthur Unger, of Chatlee, was because Chatlee could not agree upon a reasonable commission with Eden. Chatlee's people believed it had a legal duty to compensate Eden for bringing Short to Chatlee, but Levan "kept throwing numbers at me which nobody could live with." The record shows Chatlee was willing to permit Eden the same profit it would have had had the sale closed as planned, but Levan insisted on a commission of at least $250,000 from a Short–Chatlee sale. Unger testified that

---

**2.** Although Indiana law holds that a plaintiff must be a party to the contract with which he alleges tortious interference, we are not aware of any Indiana decisions addressing the standing of a third-party beneficiary who suffers harm as a consequence of tortious conduct directed at a contract's third-party beneficiaries. *Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad,* 579 F.Supp. 574, relied upon by Eden in support of its standing position, cites the Restatement (Second) of Torts, comment p as authority for its holding that to obtain protection, the plaintiff must be a party

to the contract. Comment p explains that the person protected by the rule is the specified person with whom the third person had a contract and persons other than a party to the contract who are harmed by the defendant's actions *if the defendant intends to affect them.* Since the evidence shows that Eden's tortious conduct was intentionally directed at Short, were we to conclude that Short was solely a third-party beneficiary of the Eden–Chatlee contract, we might be inclined to follow the spirit of the Restatement rather than *Organization of Minority Vendors,* as other jurisdictions have.

Levan was willing to take $100,000 in profit if Chatlee sold to someone else.

Eden maintains that the reason the Short–Chatlee sale never took place was because Chatlee and Short were unable to come to terms over compensation for the deterioration which had occurred to the property since Short first agreed to purchase it. Certainly, there is evidence in the record supporting this proposition. But, the trial court rejected this evidence, finding instead that Chatlee failed to close with Short on the same terms as the Short–Eden agreement because Eden refused to reasonably deal with Chatlee on the commission issue.

■ Eden's last contention with respect to the elements of the tort is its claim that there was no competent evidence Short was injured by his failure to acquire Eastwind. Eden discredits the evidence offered by Short relating to the terms of his deal with Schuman on the basis that it was not substantiated by a written contract and was speculative.

However, the nonexistence of a writing is not decisive of whether there was actually a contract; the parties may agree to memorialize their contract in writing at some point in the future. *International Shoe Co. v. Lacy* (1944), 114 Ind.App. 641, 646, 53 N.E.2d 636, 638. Moreover, Short's proof of his anticipated resale to Schuman is as certain as can reasonably be expected under the circumstances. Historically, every time Short and Schuman had reached an agreement at the computer on a resale for syndication, they had closed the deal with each other. True to custom, Short and Schuman had an agreement in the present case, evidenced by computer printouts, to sell Eastwind at an appreciated value to Schuman's limited partnerships in two transactions, before Short sought to close the purchase of Eastwind.

Eden suggests that because of the deteriorating condition of Eastwind, its falling occupancy rate, and the absence of evidence showing Eastwind's true value, Short has not demonstrated he could expect a benefit from the contract; but, these circumstances need not be construed adversely to Short. Chatlee acknowledged the property's deterioration and was willing to give Short consideration for it. The fact that Eastwind had been neglected and could be "leased up" and sold within three to six months made it a good prospect for syndication. And, Short's success with other projects comparable to Eastwind demonstrates his ability to turn an unprofitable complex with a low occupancy rate into a viable one.

Finally, the evidence shows that Short expected to make anywhere from $2,010,000 to better than $5 million on the resale for syndication. Given that Short had a ready buyer and the assurance of a sale at a price substantially greater than what he intended to pay for it, the true value of the property is not particularly weighty.

■ Eden also disputes the sufficiency of the evidence to sustain an award of punitive damages for its tortious interference. Eden maintains that punitive damages should not have been awarded because its actions after September 1 were based upon a good faith belief that Short was the breaching party.

■ To permit an award of punitive damages, Short must offer clear and convincing proof at the trial level that Eden acted with malice, fraud, gross negligence, or oppression and some evidence inconsistent with the hypothesis that Eden's tortious conduct was merely the result of mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing. *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1023; *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137. However, on appeal, judicial scrutiny on the issue of punitive damages is no greater than review of other sufficiency questions. We will affirm a judgment of punitive damages if, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find such damages proven by clear and convincing evidence. *Id.* If it

can be said that either of two conclusions reasonably may be drawn from the evidence, we are bound by the finding of the trier of fact. *Traina*, 486 N.E.2d at 1022. Accordingly, our task is to determine whether there is any evidence from which a reasonable person, employing the clear and convincing rule, could have found Eden's conduct to be both obdurate and inconsistent with noniniquitous human failing.

More than one witness testified that during the period of contract formation, Eden's agent, Perlstein, used his role as drafter to eliminate words and phrases in previously-negotiated contractual provisions which were unfavorable to Eden, intending that Short and his colleagues would rely upon the fact that the provisions had already been agreed upon and not look for changes. The entire tax proration provision insisted upon by Short and disadvantageous to Eden had been left out. Perlstein also oppressively delayed preparation of the closing documents, despite constant urging from Short's team, requiring Short and his attorneys to review the entire package of documents after their arrival in Miami and during the early morning hours before the closing. Eden knew that the contents of the Eden–Chatlee mortgage were critical to Short yet portrayed the document as both nonexistent, at a time when many of its provisions were known by Eden, and locked in stone, even though Chatlee's representatives were available and amenable to compromise. Eden also knew of Eastwind's deteriorating physical condition, the depletion of its inventories and the substantial decrease in rental income which had occurred while the deal was pending. It knew how important these considerations were to Short who had insisted that Eden obtain a warranty of condition from Chatlee, yet refused without apparent reason to assign these warranties to Short or inform Short that Chatlee had restricted compensation for deterioration to $20,000. Although this evidence does not directly bear upon Eden's state of mind at the time of the interference, it might well justify a reasonable inference that the entire transaction involved a continuous state of mind which culminated in the oppressive and malicious conduct which is the basis of Short's tort claim. *See Jerry Alderman Ford Sales, Inc. v. Bailey* (1973), 154 Ind. App. 632, 294 N.E.2d 617 (on rehearing).

Eden's reckless indifference to Short prior to the closing turned into maliciousness after the closing failed. Despite Chatlee's attempts at bringing Eden into the deal and its efforts to insure that Eden received a fair compensation on the sale, Eden continued to attempt to deter any sale to Short, refusing to release escrowed documents so that a sale could be completed, offering Chatlee other potential buyers, and demanding unreasonable commissions. According to Unger, Levan was "very angry with Short."

As the trial court found, the record evinces a pattern of conduct on the part of Eden which refutes the assertion that Eden's post-closing actions were taken in good faith; an award of punitive damages is appropriate on this evidence.[3]

On cross-appeal,[4] Short argues that the trial court's findings and conclusions demonstrate it applied an erroneous standard when it determined that, while Short had lost profits as a consequence of Eden's tortious interference, Short had failed to establish his "entire lost profits to a reasonable degree of certainty" such as would enable the court to award anything

---

**3.** Eden also argues that an award of punitive damages cannot be sustained without an award of compensatory damages. This contention is addressed by our resolution of the compensatory damages question.

**4.** Eden argues that Short's cross-appeal should be dismissed because he did not file a praecipe. Eden distinguishes *Seco Chemicals, Inc. v. Stewart* (1976), 169 Ind.App. 624, 349 N.E.2d 733, 739, which held that once Seco set the appellate machinery in motion by filing its praecipe, the purpose of Appellate Rule (2)(A) had been fulfilled and the cross-appellant was not required to comply with the rule, on the basis that Seco praeciped the entire record but Eden did not. Eden has not enlightened us as to which relevant portions of the record it failed to praecipe and, given the size of the record, those missing portions are not evident to us or Short. Apparently then, Eden's distinction is not one which necessitates a different result in this appeal.

more than nominal damages. Eden interprets the findings and judgment simply as a determination that Short failed to meet the law's requirement of "reasonable certainty" and argues that, when this court applies a negative judgment standard to the evidence, the evidence sustains the trial court's ruling.

The trial court's findings leave no doubt that Short met the tougher burden of certainty facing him on the issue of damages; that is, Short was able to demonstrate that profits had in fact been lost. *See Kroger v. Haun* (1978), 177 Ind.App. 403, 379 N.E.2d 1004, *trans. dismissed; Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind. App. 632, 652, 291 N.E.2d 92, 106. Likewise, as Short contends and Eden apparently concedes, a plaintiff need not be able to prove all of his lost profits to be able to recover some of them. *See Crestwood Park, Inc. v. Apostal* (1982), Ind., 431 N.E.2d 789.

Thus, the question is simply whether the evidence offered by Short was so deficient as to preclude any fact finder from making a fair and reasonable finding with regard thereto, *id.*, for, given the inherently problematic and uncertain nature of prospective profits, it is only essential that Short present such evidence as might reasonably be expected to be available under the circumstances. *See id.* The plaintiff's own reasonable testimony concerning lost profit will suffice. *Haun*, 379 N.E.2d at 1017. With these propositions in mind, we find *some* evidence of record of probative value upon which to base an award of substantial damages without resort to speculation.

The testimony of Short and Schuman leaves no doubt that Schuman intended to purchase the entire property for syndication even though he and Short had agreed only to the terms of the purchase of the first half. The purchase from Short of the first half would be consummated as soon as possible after Short's acquisition of the property for a price of $4,125,000. However, the price of the first half had been discounted to insure marketability; the purchase price of the second half would be at a higher sum because presumably the

entire project would have improved by that time and would be increasing in value. At a minimum therefore Short could anticipate a sale price of $8,250,000. He agreed to pay $6,240,000 to Eden.

Short's calculations of lost profit indicate that for the first twenty-two months of the sale of the first half during which Short had agreed to guarantee the partnership against negative cash flow, Short would receive $7,687,571.12 in principal and interest payments from the partnership. This number includes cash flow from Eastwind of $682,550.29. Short's anticipated income from operations is based upon an assumption that Eastwind would have an average occupancy of 95% beginning September 1, 1981, and rent increases of 5% in the years 1982 and 1983. Short was cross-examined extensively about this figure. He did not provide the court with a formula or go through the computation but testified that the figure took into account a number of factors based upon the information he and his staff acquired when they were in Indianapolis.

Though Short emphasized that his occupancy rate was an average figure, we agree that his anticipated profits on the operation of Eastwind are too speculative, particularly when the record shows that Eastwind was less than half occupied when Short would have received possession on September 1, 1981 and Short conceded that an average occupancy rate of 95% meant that his staff was extremely successful at filling the vacancies. Short's failure to demonstrate the method of calculating profits from operations or give the trial court his figures on the other components of the equation leaves the court with an all or nothing situation for there is not sufficient evidence otherwise to enable the court to make a determination of this element with reasonable certainty.

Short's calculations of profit on the second half of the sale include profit from operations and an anticipated increase in the sale price of $500,000. The $500,000 increase in purchase price is speculative as well since both Short and Schuman testified that while the first half purchase price

had been discounted to ensure marketability, they had not agreed upon a total purchase price for the entire property or a purchase price for the undivided second half interest. Even so, Short and Schuman had an agreement for the sale of the entire property and Short could reasonably anticipate a sale price of at least $4,125,000 on the second half. The evidence thus supports profit on the sale of the whole property, after the deduction of payments required under the Short–Eden contract of $11,439,996.64 and without any deduction for capital improvements, in the $2.5 million range rather than the $5 million sought by Short. The trial court's determination that lost profits on the sale were too speculative is correct insofar as it relates to lost profit on the operation of Eastwind; damages are however calculable with reasonable certainty with respect to profit from the sale itself. Short is entitled to compensable damages which should be determined from the evidence of record on remand.

## II.

Breach of Contract Judgment for Short

■ Eden asserts that the judgment against it on Short's breach of contract claim was necessarily based upon an anticipatory breach theory because there was no evidence offered that Short tendered the purchase price, "note and mortgage required by the agreement." Eden details all of the evidence tending to establish that it did not repudiate the agreement and argues that the record fails to show the kind of positive, absolute and unconditional repudiation required by law to excuse Short of further performance. In addition, Eden contends that the failure to prove Short's willingness to perform bars him from recovery regardless of evidence of repudiation by Eden.

■ We agree with Eden that while the record shows Short was financially ready and able to close, it does not demonstrate that in fact Short tendered the purchase price together with the executed note and mortgage described in the Short–Eden agreement to Eden on the day of closing. However, a party may be excused from tendering performance if the seller has already repudiated. *Ohio Farmers Ins. Co. v. Vogel* (1906), 166 Ind. 239, 243, 76 N.E. 977, 978; *Kocsis v. Wroblewski* (1935), 100 Ind.App. 653, 656, 196 N.E. 367, 368. Repudiation of a contract must be positive, absolute and unconditional in order that it may be treated as an anticipatory breach. *Indiana Life Endowment Co. v. Carnithan* (1916), 62 Ind.App. 567, 578, 109 N.E. 851, 854, *trans. denied.* The demanding of the other party a performance to which the party has no right under the contract constitutes such an anticipatory breach.

If one party to a contract, either willfully or by mistake demands of the other a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed. Such a repudiation is conditional in character, but the condition is a performance to which the repudiator has no right.... Where two contracting parties differ as to the interpretation of a contract or as to its legal effects, an offer to perform in accordance with his own interpretation made by one of the parties is not in itself an anticipatory breach. In order to constitute such a breach, the offer must be accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation. So, also the making of a demand upon the other party to a contract that he shall perform in accordance with an interpretation that is not justified by law is not itself a repudiation; such a demand, however, does not require much by way of accompanying expressions in order to justify the other party in understanding that no performance other than that demanded will be accepted.

A defective tender of a performance that is substantially different from that required by the contract will frequently not be operative as an anticipatory breach.... If the first and defective tender was made in such a way as to be a manifestation of intention not to perform

the contract in any other manner, there is an anticipatory breach, even though there is still sufficient time remaining in which a proper performance could be rendered.

A. Corbin, Corbin on Contracts § 973 at 961–62 (One Vol. Ed.1952).

The trial court concluded that Eden breached the Short–Eden contract by refusing to close under its terms on September 1, 1981.[5] Among the terms of the contract identified by the trial court in its findings and never disputed by Eden was the requirement that Eden obtain for Short from Chatlee by June 1, 1981 certain warranties concerning the condition of the property at closing, among them, that Chatlee would agree to maintain the property and the personalty on it in its condition until closing. Eden did in fact obtain certain agreements from Chatlee concerning the condition of the property but took the position at closing that the warranties belonged to Short only if Eden assigned them, something which it refused to do. Consequently, even if Eden had a good faith belief that the warranties of condition belonged solely to it, Eden made it absolutely clear at closing that its interpretation of the Short–Eden and Eden–Chatlee agreements concerning the condition of the property was the only interpretation that it intended to abide by. Its rejection of the May 13, 1981, addendum to the Short–Eden agreement was positive, absolute and unconditional. Confronted with this conduct by Eden at closing, Short was justified in treating the May 4, 1981, agreement with Eden as repudiated.

Eden's assertion that, regardless of its repudiation, Short is unable to recover liquidated damages because of an absence of evidence he would have been willing to close once again recasts the evidence and inferences in a light least favorable to the trial court's findings and judgment. The record shows that Short testified repeatedly that he remained willing to negotiate up until Levan stormed out of the room. These assertions are supported by the impressions of his colleagues. Short's statements that he probably would have been unwilling to close without "some consideration" need not be read to imply consideration solely from *Eden*. Had Eden acquired the warranties for Short as it promised, Short could have proceeded to obtain consideration directly from Chatlee as it ultimately would have succeeded in doing had Eden not tortiously interfered with the Short–Chatlee transaction.

As our discussion illustrates, the evidence of record does not lead solely to a determination in favor of Eden against Short on Eden's breach of contract claim. Thus, Eden is not entitled to an entry of judgment in its favor either.

### III.

#### Breach of Contract Judgment for Chatlee

The trial court entered judgment against Eden and for Chatlee in the amount of $85,000 plus interest on Chatlee's counterclaim against Eden for breach of the Eden–Chatlee agreement. The court found that Chatlee and Eden closed their transaction in escrow on August 31, 1981, Eden failed to satisfy the terms of its escrowed closing with Chatlee and therefore breached its agreement with Chatlee, entitling Chatlee to liquidated damages.

The Eden–Chatlee agreement provides:

If ... the Seller [Chatlee] shall tender the Deed in compliance with its obligations hereunder, and if the Purchaser [Eden] shall fail or refuse to close title as required by the terms of this Agreement; or ... the Purchaser otherwise is in default hereunder so that the Seller has the right to refuse to close title, then, the Seller's sole remedy shall be to receive the Deposit placed hereunder as liquidated damages ...

---

5. The record and factual findings suggest various bases for the trial court's conclusion that Eden breached the terms of its agreement with Short, among them, the matters of proration, allocation of principal to interest, and stringen-cy of Short's mortgage to Eden. Inasmuch as we have found the trial court's findings and judgment sustained by Eden's unwillingness to assign the warranties to Short, we need not discuss further these other possible grounds.

The Eden–Chatlee agreement executed March 6, 1981, required Eden to pay a $20,000 deposit, to be credited toward purchase price. The amount of the deposit was increased by modification agreement dated May 28, 1981, to $85,000: "[t]he deposit hereunder ... shall be the aggregate sum of $85,000.00 ..." The modification agreement also permitted Eden to elect to "assign to CHATLEE all of EDEN'S right, title, and interest in and to that deposit placed by Short ... to the extent due to EDEN in the event of a default under said Short Contract, and to direct the Escrow Agent under the Short Contract to disburse the deposit thereunder in the event of default to CHATLEE to satisfy said requirement."

Hence, the modification agreement did not purport to modify "said requirement" to pay liquidated damages in the event of default. It only permitted Eden to assign its interest should it become due Eden in the event of a default under the Short contract. The trial court correctly ordered Eden to pay liquidated damages of $85,000 to Chatlee.

## IV.

### Liability of the Other Eden Defendants

The Eden defendants, Bankatlantic Financial Corp., formerly I.R.E. Financial Corp., Eden Services, Inc., I.R.E. Investments, Inc. and I.R.E. Properties, Inc., challenge the judgments against them in favor of Short and Chatlee which were founded on the determinations that the Eden defendants, referred to by the court as the I.R.E. companies, were engaged in a joint venture with Investment Management Group, Inc. (IMG) in regard to the Eastwind transaction and that Eden was a corporate instrumentality of I.R.E. Financial, which through Levan, used other corporate instrumentalities on an interchangeable basis to conduct its activities in this transaction. Appellant IMG joins in the argument of the other Eden defendants in challenging the judgment against it and also separately maintains that Chatlee's stipulation at the hearing on IMG's motion to correct error, that it was not pursuing a judgment against IMG, precludes the trial court from assessing liability against it in favor of Chatlee. Inasmuch as Chatlee seeks no judgment against IMG or the Eden defendants other than I.R.E. Financial, Eden's parent corporation, we direct that the judgment against Eden Services, Inc., I.R.E. Investments, Inc., I.R.E. Properties, Inc. and IMG in favor of Chatlee be vacated.

The Eden defendants contend that an equal right to direct and govern the undertaking must be shown to establish a joint venture and that the evidence in the present cases fails to show such an *equal* right to direct and govern the undertaking. Indeed, the cases cited by the Eden defendants do appear to require that the parties to a venture each have the ability to exercise equal control over the undertaking. *See e.g. Mantooth v. Federal Land Bank* (1988), Ind.App., 528 N.E.2d 1132, *trans. denied; Stallings v. Dick* (1966), 139 Ind. App. 118, 134, 210 N.E.2d 82, 91, *trans. denied; Hogle v. Reliance Manufacturing Co.* (1943), 113 Ind.App. 488, 48 N.E.2d 75. But, our common law as a whole, while requiring that a party have the ability to exercise mutual control over the subject matter of the enterprise or property engaged therein, has never imposed an all-inclusive definition or fixed and certain boundaries on the legal concept, *Davis v. Webster* (1964), 136 Ind.App. 286, 296, 198 N.E.2d 883, 887; nor has it weighed in a comparative fashion the extent of control exercised by the parties to a venture. *See e.g. Mantooth,* 528 N.E.2d 1132 (Written agreement gave both parties *right* to control but facts showed Boyer exercised control); *Baker v. Billingsley* (1956), 126 Ind. App. 703, 132 N.E.2d 273, *trans. denied.* We also decline to impose such a mechanistic approach, particularly here where the evidence establishes that the various corporations contributed resources and labor toward the success of the enterprise but under the direction of a single person who determined the extent of participation and compensation of each corporation. In this respect, it can be said that each corporate venturer had a mutual or equal right of control because none of them had any

greater right of control than Levan allowed.

However, it is clear from the record that IMG had no authority or control over the Eastwind transaction. Kranz, IMG's only shareholder, testified that IMG is an independent contractor which handled the marketing and negotiation of the Eastwind sale. Even so, IMG's sole client was the I.R.E. Group. Levan had the ability and did exercise his authority over Kranz even as to Kranz's compensation. IMG did not function as an independent contractor in the purchase and sale of Eastwind but as an instrumentality of I.R.E. Financial and Levan. It had no right to exercise mutual control over the venture and cannot be held liable on that theory.

The Eden defendants also insist that they cannot be liable for Eden's tortious interference because as a matter of law the joint enterprise ended when Eden failed to close with Short on September 1, 1981. This argument turns upon how one defines the collective venture. The Eden defendants chose to characterize the joint enterprise as the purchase and sale of Eastwind to Short. If in fact the purpose of their joint enterprise had been so narrowly defined, one would expect no further involvement on the part of any of these defendants in the post-contract tortious activity. Yet, the record shows that in fact the participation of certain of the corporate defendants extended beyond the closing with Short and actually involved conduct which the trial court cited as indicative of the pattern of interference engaged in by Eden to prevent the sale of Eastwind to Short. For example, Steven Santolla, representing I.R.E. Financial Corp. and subsequently I.R.E. Investments, Inc., and Levan, representing I.R.E. Investments, Inc., continued to send prospective purchasers to Chatlee and to demand commissions for I.R.E. Investments after the aborted closing at lower rates than demanded from a Short–Chatlee sale.

Alternatively, the judgments against the multiple defendants collectively can be sustained based upon a corporate instrumentality theory. The Eden defendants' challenge to their liability under the corporate instrumentality doctrine is simply an attempt to engraft an additional element of proof, namely, that the plaintiff actually must be misled about the identity of the party with which he is dealing, upon an otherwise flexible test. In Indiana, we have routinely refused to identify a single formula to be applied in every situation but have treated each case as sui generis, permitting the corporate veil to be pierced only after careful review of the entire relationship between the corporations. *Stacey–Rand, Inc. v. J.J. Holman, Inc.* (1988), Ind.App., 527 N.E.2d 726. Even so, it is clear from our decisions that the key factor in any decision to disregard the corporate status of a tortfeasor is the element of control or influence exercised by the entity sought to be held liable for the corporation's affairs. We have generally required that the circumstances show control by the parent to such a degree that the subsidiary has become its mere instrumentality, and we have imposed two other conditions: (1) that there be evidence of the perpetration of a fraud or wrong by the parent through its subsidiary, i.e. the violation of a legal duty; and (2) unjust loss or injury to the claimant, such as caused by the insolvency of the subsidiary. The cases cited by the Eden defendants, *Secon Service System v. St. Joseph Bank & Trust Co.* (7th Cir., 1988), 855 F.2d 406 and *Extra Energy Coal Co. v. Diamond Energy & Resources, Inc.* (1984), Ind.App., 467 N.E.2d 439, are consistent with this approach; they do not compel the conclusive test sought by Eden.

As we have indicated, the degree of control exercised over a subsidiary can be shown by any number of circumstances, there being no single talismanic factor which would justify a court with impunity in piercing the corporate veil. *Burger Man, Inc. v. Jordan Paper Products, Inc.* (1976), 170 Ind.App. 295, 352 N.E.2d 821, *trans. denied.* Thus, in *Urbanational Developer, Inc. v. Shamrock Engineering, Inc.* (1978), 175 Ind.App. 416, 372 N.E.2d 742, *trans. denied,* on facts nearly identical to those involved here and without regard to whether the complaining party actually

had been misled about the party with which it was dealing, we held that the fiction of corporate entity should be disregarded. There, the evidence showed that the wholly-owned subsidiary was formed to enable the parent to make a profit, the corporations shared officers and presidents, the subsidiary had no assets, equipment or employees, and the subsidiary's only function was to process paperwork even though that was carried on by employees of the parent corporation who received no wages for those services from the subsidiary.

The record in the present case discloses that Eden, a corporation with no assets and no ongoing business, was chosen by Levan as the instrumentality to purchase and sell Eastwind on behalf of the I.R.E. Group, the umbrella organization of some twenty companies affiliated with various I.R.E. companies. I.R.E. Financial, the parent company of Eden and a publicly-traded financial services corporation of which Levan owned 4%, paid certain of the costs of the transaction and furnished its employee, Levan, to negotiate the deal on behalf of Eden. Apparently, Eden had no employees other than Levan at the time. Levan did not know how many directors Eden had or who the other officers of the corporation were. Eden occupied office space in I.R.E. Financial's suite, though no one actually occupied the space, and shared Financial's office staff, equipment and stationery. Eden borrowed employees from the other I.R.E. corporations at Levan's direction but paid them no compensation.

The Eden defendants argue that the corporate instrumentality doctrine has been misapplied in this case because the trial court went beyond holding Eden's parent company liable for its actions but also spread liability among the affiliated I.R.E. companies, its brother-sister corporations. While admittedly there is little precedent in Indiana for such an action, *see e.g. Stacey–Rand, Inc. v. J.J. Holman, Inc.* (1988), Ind.App., 527 N.E.2d 726; *and cf., Old Town Development Co. v. Langford* (1976), Ind.App., 349 N.E.2d 744, *opinion vacated and appeal dismissed,* 267 Ind. 176, 369 N.E.2d 404, other jurisdictions have disregarded the corporateness of affiliated corporations when the corporations are not operated as separate entities but are manipulated or controlled as one enterprise through their interrelationship to cause illegality, fraud or injustice or to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. *See e.g. Camelot Carpets, Ltd. v. Metro Distributing Co.* (1980), Mo.App., 607 S.W.2d 746. Indicia of common "identity," "excessive fragmentation" or "single business enterprise" corporations include the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public; the interdependence of the corporations for supply and demand; the failure to observe formalities of separate corporate procedures for each corporation or to document transfers of funds; inadequate financing of one corporation as a separate unit from the point of view of meeting its normal obligations, either because of inadequate financing initially or because its earnings have been drained off to keep it in a condition of financial dependency; and, the direction of company policies of one corporation primarily toward the interests of an affiliate. *See Paramount Petroleum Corp. v. Taylor Rental Center* (1986), Tex.App., 712 S.W.2d 534, 536; *Camelot Carpets,* 607 S.W.2d 746; H. Henn and J. Alexander, Laws of Corporations § 149 at 357–58 (3d Ed.1983). *See also Glenn v. Wagner* (1984), 67 N.C.App. 563, 313 S.E.2d 832, 844 *citing* Latty, Subsidiaries and Affiliated Corporations, Chap. VIII (1936).

The Eden defendants meet many of the indicia listed above. In the early stages of the Short–Eden transaction, Short and his associates knew only that they were working with I.R.E. Indeed, at this stage of the transaction, neither IMG's Kranz nor I.R.E. Investments' Newman knew for which corporation they were working. Kranz represented himself as Vice–President of the I.R.E. Group at Levan's direction on the marketing brochures and Newman knew only that he was working on behalf of the licensed real estate brokerage arm of the

firm, whichever entity that was. Newman signed as Vice–President of Eden on the documents between Eden and Chatlee, again at Levan's direction, as he did in other transactions, whenever Levan decided to make him V.P.

Each of the defendant corporations served a distinct function but all related to the single business enterprise of acquiring Eastwind. Eden Services, Inc., another wholly-owned subsidiary of I.R.E. Financial, provided Eden with the original escrow deposit of $20,000 until Short's $85,000 deposit was substituted. The "loan" was not documented in any way other than by the notation of a receivable on the books of Eden Services. I.R.E. Investments, Inc., a wholly-owned subsidiary of I.R.E. Properties, Inc., an affiliated company of which Levan was also president and 60% owner, acted as the broker for the Eastwind transaction. It had no brokerage agreement with Eden or I.R.E. Financial, though it had an understanding that it would be paid a commission upon completion of the transaction, the amount of compensation to be negotiated after the sale was complete. I.R.E. Investments paid the traveling expenses for the various participants regardless of their corporate affiliation. I.R.E. Properties for whom Newman, Kranz and Santolla apparently worked at one time, acquired real estate for the group and sponsored limited partnerships designed to invest in real estate. Newman found the investment opportunity in Eastwind, Kranz marketed it and Santolla, a trainee, provided onsite "due diligence" services.

There is no showing in the record that any of the Eden defendants carried on any business other than that supplied by I.R.E. Financial or one of its counterparts and no indication whatsoever that any of these corporations observed the formalities of corporate procedure or documented any of their agreements among each other. Eden signed no note for the loan of the escrow deposit, lease for its office space, brokerage contracts or employee paychecks, and it does not appear there were any other formal agreements between the affiliated corporations. Significantly, the decision-maker for each of the affiliated corporations with respect to the Eastwind transac-

tion was Levan. At his direction, the interests of each of the Eden defendants were directed toward the accomplishment of the Eastwind transaction. Levan had an ownership interest in each of the affiliated companies but IMG; there can be no doubt on this record that he had the ability to exercise control. That Levan used Eden solely as a means of sheltering the other Eden defendants and Eden's parent corporation from liability was Levan's testimony and evident from the record.

The trial court did not err in holding the other corporate entities liable for Eden's actions. Under the facts of this case it would be unconscionable to permit the participants in the enterprise to escape liability because the transaction was intentionally carried on in the name of an inadequately capitalized affiliate.

Judgment affirmed in part, reversed in part as to compensatory damages and the liability of IMG, and remanded for an award of compensatory damages.

CONOVER, J., concurs.

SHIELDS, J., concurs in result.