57 A.3d 1041

**B–LINE MEDICAL, LLC**

v.

**INTERACTIVE DIGITAL SOLUTIONS, INC.**

No. 1085, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Dec. 20, 2012.

**26**

28

Bryan D. Bolton (Michael P. Cunningham, Funk & Bolton PA, on the brief), Baltimore, MD, for Appellant.

Steven J. Lewicky (Angela Grau, Davis, Agnor, Rapaport & Skalny, LLC, on the brief), Columbia, MD, for Appellee.

Panel: DEBORAH S. EYLER, WRIGHT, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

WRIGHT, J.

This appeal arises from a jury verdict in favor of appellee, Interactive Digital Solutions, Inc. ("IDS"), on counts of breach of contract, tortious interference with contract, and tortious interference with business relations. The jury awarded undifferentiated damages totaling $769,422 and on June 8, 2011, the Circuit Court for Howard County entered judgment against appellant, B–Line Medical, LLC ("B–Line"). On June 20, 2011, B–Line timely filed a Motion to Revise Judgment, a Motion for Judgment Notwithstanding the Verdict ("JNOV"),

and a Motion for a New Trial. On July 28, 2011, the circuit court denied the motions. On August 1, 2011, B–Line filed this appeal.

## Questions Presented

B–Line asks us to determine:

1) Whether the judgment on plaintiff's contract claim must be reversed because (a) as a matter of law no work was subcontracted to B–Line in connection with the Clarian Simulation Center under the Mutual Subcontract Agreement, and (b) the trial court failed to instruct the jury on the interpretation of contract provisions restricting competition under Maryland law?

2) Whether the judgment on the tortious interference with contract and business relations claims must be reversed because (a) the trial court's jury instructions were contrary to Indiana law and Indiana's civil pattern jury instructions; (b) as a matter of law IDS was not a third-party beneficiary of any contract or relationship between Clarian Health Partners, Inc. ("Clarian") and AT & T Communications, Inc. ("AT & T"); (c) as a matter of law no valid and enforceable contract existed between Clarian and AT & T at the time of the alleged "interference" and the jury instructions permitted the jury to speculate about the existence of an oral or implied contract contrary to the statute of frauds; (d) B–Line's conduct was not "illegal" as a matter of law; and (e) IDS had no protected business relationship with Clarian as a matter of law?

3) Whether the undifferentiated damages award must be vacated if any part of the judgment is reversed?

IDS presents one issue on cross-appeal, which IDS asks us to address only if we remand the case for a new trial:

1) Whether the trial court erred in striking the Second Amended Complaint?

Finding no error or abuse of discretion, we affirm the circuit court's judgment. As such, we need not address B–Line's third question or IDS's cross-appeal.

### Facts

B–Line is a Maryland limited liability corporation that creates proprietary medical simulation software used to train medical and nursing students and other healthcare professionals. IDS is an Indiana corporation that creates and sells video networking products for use in interactive distance learning, web-based training, and other purposes as well as sells media distribution, consultation, installation, and maintenance services.

On or about March 20, 2006, B–Line and IDS entered into a Mutual Subcontract Agreement ("MSA"), a teaming arrangement where the parties could bundle their services to sell as a package to prospective customers. The MSA was a non-exclusive agreement whereby either party could, but was not required to, contract with the other to provide services or materials in connection with a project in which the other party was involved. Under the MSA, a project would be initiated when the "Prime," or party entering a contract with a third-party, requested that the non-contracting party become the "Supplier" of goods and services under the contract. If either B–Line or IDS had a relationship with a third-party client, the other party was barred by the MSA from providing services to that client unless the party with the existing relationship consented in writing. Section 3.1.5 of the MSA states that "Supplier shall not provide any service directly to a client for solutions provided as a subcontractor to the Prime without written authorization from the Prime."

When the MSA was formed, B–Line was involved in two projects [1] for which it needed an audio-visual integrator, as was IDS. Pursuant to the MSA, because B–Line brought IDS into each of those two projects, B–Line was the Prime and IDS was the Supplier. These projects were completed without any difficulties.

---

1. One project was for Vanderbilt University in Nashville, Tennessee. The other project was for the University of Texas Medical School at Houston in Houston, Texas.

In the latter half of 2006, Clarian, an Indiana non-profit corporation that owns and operates several hospitals and medical centers in Indiana, engaged in a joint venture with the Indiana University School of Medicine & School of Nursing ("IU") to construct a new building for the medical and nursing schools containing a clinical skills simulation center ("Clarian Simulation Center").[2] In late 2006, AT & T, a corporation engaged in numerous communications activities, including extensive work with Clarian,[3] submitted a proposal to Clarian to design, implement, and support the Clarian Simulation Center. AT & T had both an existing relationship with Clarian and a teaming arrangement in place with IDS. In its proposal to Clarian, AT & T included IDS as its subcontractor for the video simulation center portion of the project. In turn, IDS included B–Line as the provider of software in its proposal to AT & T. IDS's proposal comported with § 14 of the MSA, which stated that B–Line appointed IDS as the exclusive distributor of its products to AT & T.

On November 28, 2006, AT & T, IDS, and B–Line gave a presentation to Clarian and IU representatives.[4] At the time of this presentation, Clarian and IU were considering two software solutions—the one presented by the AT & T/IDS/B–

---

2. According to the testimony of Tracy Mills, the President of IDS, the Clarian facility was to be the largest facility of its kind in the world.

3. According to Cook's testimony at trial, AT & T was responsible for Clarian's entire data network infrastructure and support. As a result of the amount of work AT & T did for Clarian and IU, AT & T had a Master Contract Agreement in place with Clarian which meant that when Clarian wanted to contract with AT & T for additional work or equipment, it only had to issue a purchase order to AT & T rather than repeatedly negotiate the terms of a new contract for each project.

4. Mills testified that AT & T was brought in because of its size and extensive contacts, with the ultimate goal of having AT & T sell the IDS/B–Line package throughout the country.

Mills also testified that he ran the video-conferencing group of AT & T for ten years and left to form IDS in 2000 "as an organization to be symbiotic to AT & T and to be able to enhance and do things that AT & T wasn't able to do ... like simulation centers." Mills testified that IDS had numerous employees who worked twenty or more years at AT & T, creating a very trusting relationship between them.

Line team, and one presented by another vendor. In January 2007, AT & T, IDS, and B–Line made a second team presentation to Clarian and IU representatives. It is undisputed that the purpose of the meetings was to sell B–Line's software to Clarian, who was already familiar with AT & T and IDS.

On February 9, 2007, the Midwest regional sales representative for IDS, Zac Cook, was notified via phone call by Melody Korous, a Clarian project manager, that Clarian had selected the AT & T, IDS, and B–Line team. Cook then sent an e-mail to AT & T and B–Line stating that "[w]e were just awarded the project for the Clarian/IU Medical Clinical Skills & Simulation Center!!!" Dave Ramsay of B–Line responded, "Great news Zac! Best I've heard in a while [sic]. Let me get back to you about our availability for the next meeting and who will be attending." IDS subsequently engaged in planning and design work, including development of detailed floor plans for the Clarian Simulation Center. From March 2007 until September 2007, B–Line worked with IDS to provide data, equipment lists, specifications, and requirements for IDS to incorporate into the plans.

On May 15, 2007, Korous sent Cook an e-mail stating that Clarian wanted to pay a retainer fee for the project. On June 29, 2007, Clarian faxed an executed Master Purchase Agreement and issued a written purchase order ("P.O.") to AT & T, agreeing to pay $160,000 as a ten percent down payment on the then-estimated project cost of $1.6 million to compensate AT & T and IDS for the work performed between February and June 2007. AT & T then paid IDS $159,400 for its design services, which constituted Phase I in the Master Purchase Agreement. B–Line was to be paid under Phase II, when AT & T and IDS received a second purchase order from Clarian. Lucas Huang, then-Chief Executive Officer of B–Line, testified that, with rare exceptions, it was normal for B–Line to "consult" and provide "advice during [the] whole [design] process" without being paid.

B–Line created the "detailed, room-by room equipment requirements that formed the basis for this Scope of Work

document" comprising Phase II. B–Line reviewed and approved the completed design work in September and the completed designs were then provided to Clarian. Cook testified that various departments within Clarian and IU were contributing funds to the project's budget, which caused delays in getting the P.O. for Phase II issued. Cook stayed in regular contact with Korous and Clarian, and on November 8, 2007, Korous sent Bob Brake, the AT & T account executive assigned to Clarian and IU, an e-mail stating that "although we have approved project, we can't dedicate dollars until we know for sure where they're coming from. Once we have this figured out, we'll get you to sign the contract. We plan to deliver the P[.]O[.] and contract at the same time."

On December 28, 2007, AT & T received a second P.O. from Clarian for $1,890,000, the balance of the contract after the down payment for the design work was paid. The second P.O. encompassed the B–Line software modules, hardware, and corresponding services for implementation and contained the same Scope of Work document that was approved by B–Line in September 2007. The P.O. referenced Master Agreement No. 705568, which was signed between Clarian and AT & T in 2004.[5] AT & T, to satisfy internal procedures, then submitted to Clarian several addenda to the June 2007 Master Purchase Agreement it had with Clarian, delaying the ordering of work under the second P.O.

Meanwhile, problems arose between B–Line and IDS on a separate IU Nursing School project, where IDS was acting as the Prime and B–Line was the Supplier. Succinctly, B–Line

---

5. The Master Agreement between AT & T and Clarian states that "[a]ny AT & T Affiliate or Customer Affiliate may sign an Attachment in its own name and such Affiliate contract will be considered a separate, but associated, contract, incorporating these General Terms and Conditions ... AT & T and Customer shall be responsible for their respective Affiliates' performance pursuant to such Affiliate contract." Affiliate is defined in the Master Agreement as "any entity that controls, is controlled by, or is under common control with such party." AT & T is defined as "AT & T, its Affiliates, and its and their employees, directors, officers, agents, representatives, **subcontractors,** interconnections service providers and suppliers." (Emphasis added).

had continued to develop its software over the course of the year in other projects, necessitating the use of particular equipment that was outside of the Nursing School's budget by $50,000. According to Mills, B–Line refused to accommodate the Nursing School's budget by removing a module from its software. To resolve the problem, B–Line agreed to discount the software by $20,000 and IDS agreed to absorb the remaining $30,000 cost.

On December 28, 2007, Huang sent an e-mail to other B–Line personnel, in which he proposed to send the following e-mail to IDS:

> Enough. B–Line Medical will do an additional discount of Twenty Thousand Dollars. No changes to existing software or commitments ... it is obvious that there is not a very good chemistry between our two organizations.[6] Moving forward, B–Line Medical desired [sic] not to be sold by I.D.S. and will not be a subcontract to I.D.S. This includes Clarian. B–Line Medical will formally inform Clarian, and it can decide to commit to B–Line Medical directly, or go with another vendor.

Mills and Huang both testified that no one from B–Line informed IDS of the decision to terminate their relationship. Mills testified that by January, he believed all the disputes between IDS and B–Line regarding the Clarian Simulation Center project and the smaller IU Nursing School project had been resolved, while Huang testified that he was "furious" about the Nursing School problems.

In January 2008, the problems escalated when, because of concerns with the AT & T proposed addenda to the contract, Clarian assigned Vern Berridge to the Clarian Simulation Center project. In January 2008, Berridge approached IDS with questions about the end-user licensing agreement for the B–Line software, and a meeting was held in which AT & T explained that the Master Contract

---

**6.** This statement relates to the dispute between IDS and B–Line regarding the IU School of Nursing in which IDS was acting as the Prime.

between AT & T and Clarian covered any issues. When Berridge still had questions about the B–Line software and a conference call could not be scheduled, IDS gave Berridge B–Line's contact information so he could contact them directly for answers. Berridge and Huang thereafter had numerous conversations regarding the project that did not involve IDS. Berridge expressed confusion about the relationship between IDS and AT & T, and concerns about IDS acting as the Prime on the project, which IDS and AT & T attempted to allay, but B–Line did not.

An internal Clarian e-mail from Don Hellum, the construction manager on the Clarian Simulation Center project, to Berridge dated January 28, 2008, stated:

> I understand we have a few details to work through before Clarian is satisfied regarding the contract language for the AT & T and B–Line system. That being said and information coming as soon as Zac [Cook] can respond to your questions, can we get something started?

> We have a P[.]O[.] cut by accounting for the entire amount we are spending on the AT & T Contract ($2,050,000).

Berridge replied that he wanted to clarify each party's roles before proceeding, and Hellum responded by explaining that Clarian had "paid for time spent regarding concepts and programming as a retainer ($160,000). [IDS] has been running the show with B–Line as backup, up to this point." Berridge then replied in a January 30, 2008 e-mail to Hellum that "[a]fter direct conversation with B–Line ... I am very apprehensive about current player arrangements in this implementation."

Huang testified that in his first conversations with Berridge, he told Berridge that the arrangement most likely to yield a successful project was one in which Clarian contracted directly with B–Line for the software solution and separately with an AV integrator for the implementation. On January 29, 2008, Huang agreed with Berridge that B–Line and Clarian would enter a direct agreement within forty-five days to provide Clarian with a complete integrated solution of software, hard-

ware, and training. Huang told Berridge that B–Line would validate the design work previously prepared by IDS and would reuse IDS's work. By letter dated January 29, 2008, Huang offered for B–Line to take over AT & T and IDS's role as Prime on the Clarian Simulation Center project and asserted that B–Line had had "very little interaction" with Clarian end users since the initial presentation meeting. Huang's letter states that B–Line would assume the role of Prime on the Clarian Simulation Center project at Clarian's request and for a fee of five percent of the project cost. Huang's proposal to Berridge indicates that B–Line would choose the AV integrator, stating in part:

> B–Line Medical's wealth of knowledge and expertise has not been directly accessible by Clarian Health by Clarian Health end users and the current state of the overall system design may or may not reflect best in class simulation center design topology.
>
> B–Line Medical takes a great deal of pride in every simulation center that it helps design, and wants to be a long term partner with Clarian Health to insure that its new simulation center has the best in class AV and IT infrastructure to support simulation activities for the near and long term. Based on B–Line Medical's experience, the most advantageous project structure involves B–Line Medical working very closely with Clarian Health to do the following:
>
> 1. Meet with simulation center end users, IT team, architects, and project managers to refine and detail out short term and long term center-wide functionality. This includes review of work performed to date.
>
> 2. B–Line Medical develops a budgetary proposal to deliver the desired functionality and adjusts the proposal to meet any budgetary constraints.
>
> 3. Review final design proposal with end-users to insure desired functionality is in place as well as infrastructure to support future enhancements as needed[.]

4. Create an AV bid package to be sent to multiple qualified AV integrators that will finalize detailed system design, and perform the necessary AV integration.

5. Require any of the AV integrator responders to come on-site to present their proposed solutions, review qualifications, and mutually select desired AV integrator.

6. Clarian to manage any final price negotiations with the AV [i]ntegrator as necessary[.]

7. Time line for the above items is 2 months in total. 1 month to create the bid package and 1 month to select the best AV [i]ntegrator.

8. Upon AV [i]ntegrator selection, work closely with the AV [i]ntegrator and construction project managers to insure that the fully operational system is delivered on-time for a September 2008 go-live date (barring any construction related delays)[.]

9. Timeline for implementation should be 150 to 180 days from date of AV [i]ntegration award.

10. There is no cost for the above service, but B–Line Medical would request to be reimbursed for any travel expenses related to items 1–7 and request an initial deposit towards the purchase of B–Line Medical's software solution. The deposit will be discounted from overall B–Line Medical software product pricing.

In the e-mail sending the proposal, Huang reiterates that "although Clarian is fine with using B–Line Medical as the overall software solution, given the magnitude of the AV project, it needs to be bid out to multiple AV vendors to [e]nsure Clarian is getting the best value for its investment."

Additionally, on January 29, 2008, B–Line was having internal discussions about sending a non-disclosure agreement ("NDA") to Berridge. B–Line President, Chafic Kazoun expressed his concern in an e-mail to Huang, stating, "[y]ou do realize that if he sends this around his team, someone on his team probably has a relationship with IDS which means no

matter what he does it will very likely get back to IDS. What guarantee do we have that it won't?" David Ramsay, in an e-mail to Huang, suggested "[i]f they [Clarian] are willing to sign an NDA on this delicate issue, take them up on it. A bit embarrassing up front, but could save us a lawsuit." B–Line included a NDA with its proposal to Clarian, but the NDA was never signed.

On January 30, 2008, a few hours after Berridge sent an e-mail to Hellum asking for "input before making this change" and expressing his "apprehension," Berridge sent an e-mail to Huang agreeing to replace AT & T and IDS with B–Line. Berridge's e-mail states, "I believe I have what I need to make this change official by mid-next week.... To be clear on Clarian's desires with B–Line Medical, we would like B–Line to be responsible for ensuring the overall successful implementation of the project and include that cost in your overall solution price."

On January 31, 2008, Korous e-mailed Berridge the following:

> I respect your review and understand the direction you are headed. However, please be careful in making the claim below about IDS. You need to know and understand that one of the compelling reasons the operations group (and steering committee) chose B–Line last year was because they were partnered with a local company that would be readily available to our group to help implement our needs ‚and to provide annual service support. This is one of the reasons we didn't go with our competitors—EMS, because they did not have a local partner on board for our center. This claim really concerns me because the group has been more than pleased with working with IDS and feels that we have been able to come up with the best solution for our Center. David Boyer was also a strong advocate for the B–Line/IDS partnership as he has worked with IDS in the past and highly recommended them for our group. I can't speak to AT & T, but have been more than pleased with working directly with IDS on our solution.

Korous testified in her deposition, which was presented to the jury, that she was concerned that Berridge's actions would result in the operations group having to start the design process over again and delay opening. Korous further testified that her concerns were unwarranted because, as discussed below, B–Line took the detailed Scope of Work document prepared by IDS, presented it to Clarian, and then provided that document to other vendors.

On February 6, 2008, Brake sent an e-mail to Korous explaining that while they were separate companies, IDS was AT & T's exclusive partner and that AT & T was the warrantor of the work performed by both IDS and B–Line. This e-mail was in response to Berridge's concerns that IDS was a small company, and that Clarian would be unable to recover from IDS should something go wrong with the project. Brake stressed that Berridge could not "alter the relationship" and that because AT & T brought B–Line into the opportunity, B–Line was prevented by the agreement it had with IDS from changing its status as Supplier. On February 20, 2008, Brake sent an e-mail to Berridge clarifying the relationship of the parties, reminding Berridge that the roles were defined in the 2007 Request for Proposal and 2007 presentations, reiterating IDS's existing relationships with AT & T and Clarian, and stating that "[a]sking us to clarify those roles and to work with you to insure you get the best solution possible is welcomed. To ask us at this late date to redefine the partnership or attempts to unhook our relationship are not acceptable."

On February 20, 2008, Mills stated in an e-mail to B–Line that "[Huang] has confirmed that he has not heard from [Berridge] working with Clarion [sic] directly and [Berridge] evidently told [Huang] that the customer was frustrated with us, we have followed up with them and they have told us that this is not the case that [ ] their real frustration is internally with [Berridge]." E-mails between Brake and Huang on February 20, 2008, show that Huang disagreed that AT & T was responsible for bringing B–Line into the project, but Huang states that "[B–Line] will continue to stay out of the matter out of respect for the partnership and I hope you are

successful in convincing Clarian to move ahead." Mills also requested a conference call with Berridge and B–Line to clarify what IDS was working on. Within B–Line, Ramsay e-mailed Huang, stating, "I would go ahead and participate at this point. We have made our position very clear. No need to get into an all out war if this ends up going ahead as planned."

IDS was continuing to try and work with Clarian to resolve any confusion regarding its ability to perform the contract. IDS was also still communicating with B–Line regarding design changes and sending documentation to B–Line. On February 23, 2008, Brake was reassuring Berridge that B–Line was responsible for the design and would have a prominent role in the implementation stage of the project. IDS was unaware that in February or early March 2008, B–Line entered formal negotiations with Clarian, resulting in a written Purchase Agreement between B–Line and Clarian that excluded AT & T and IDS.[7]

On March 5, 2008, Brake met with Berridge and Clarian's Chief Information Officer, which resulted in AT & T agreeing that Clarian would enter into a separate contract with B–Line for its software and a separate contract with AT & T for the integration work, essentially "two separate primes and no subs." On March 6, 2008, Brake relayed this to Huang, who responded that "[t]his is very good news. We are very comfortable with this arrangement. I hope you feel the same. Please let me know if there is anything I need to do to help make this arrangement work." On March 10, 2008, IDS removed B–Line's products from the proposed scope of work and updated the pricing for AT & T's contract with Clarian.

On March 19, 2008, Clarian held a meeting with B–Line regarding the new arrangement. In an e-mail on the same day, Korous stated that "B–Line is going to take our original Scope of Work document from IDS and make some additional refinements." Brake e-mailed Huang several times between

---

7. This Purchase Agreement was not signed until October 2008.

April 16 and 22, 2008, regarding submitting final contracts to Clarian, which Huang did not answer.[8] By April 17, 2008, B–Line had submitted a final proposal, proposed contract, and a proposed statement of work to Clarian that did not include AT & T and IDS. An e-mail from Berridge to B–Line on April 25, 2008, states that he was expecting B–Line to act as the Prime for the project.[9] B–Line's response, while stating that it was "comfortable with AT & T/IDS's approach and total figures," also states that "we can provide equipment lists, qualified AV vendors and help with the selection process." The following e-mail exchange then occurred. Berridge replied:

> I would like B–Line to both provide other potential implementer's [sic] we should be looking at as well as to agreed [sic] upon whoever we contract with. I understand B–Line's desire not to carry the equipment but again, Clarian desires a complete solution. It would do us no good if the software is working but the hardware is not talking. We really want to ensure tight integration between B–Line and the hardware implementer.

B–Line then responded:

> That is certainly a fair request. We always work extremely hard at the software to hardware integration regardless of the AV vendor as that is what our system's success hinges on, but moving ahead with a known vendor, whether it is AT & T/IDS or someone else is a big plus. We are happy to facilitate the bid process and will pass everything directly through to you but we ask that our contract get executed before initiating this process.

Several days later, Berridge stated:

> Clarian will need to see and approve the total cost of the solution at one-time. Our management will not approve

---

**8.** Huang testified that he received the e-mails.

**9.** Berridge's e-mail states that Clarian and B–Line "had also discussed having a detailed parts list for the non-B-Line provide[d] equipment that would allow Clarian to compare several potential provide[r]s of this equipment and implementation **if we decided not to source the entire project with B–Line**." (Emphasis added).

pieces and parts of the solution individually. We must provide at least two bid's [sic] on the hardware for the solution. I understand that IDS is providing one bid, I'm expecting that B–Line will to [sic] provide one additional bona fide bid for the hardware.

However, IDS was unaware of the bid process until May 15, 2008, at which point Brake requested a copy of the bid from Berridge and Huang. Later that day, Huang e-mailed Mills and Brake with "the bid package that I sent out to the AV Integrators 2 days ago." Berridge responded to Brake:

While I was not aware of a bid having already been done for this work (would you please send me a copy of the first bid?), please find attached the scope of work we have asked others to provide a bid. This is a Clarian initiated and managed bid process, so please feel free to contact me directly with any questions concerning either the SOW or the bid process.

As I've indicated previously, Clarian has asked that all final bids be in to us no later than the close of business on May 23rd. Please let me know if AT & T plans to provide an alternative proposal to what Clarian received from AT & T on May 7th.

Upon receiving the bid package, AT & T notified Clarian that proprietary IDS pricing and design information was being disclosed to potential vendors in the package. While protesting that Clarian had already awarded it the Clarian Simulation Center project, AT & T submitted a bid and was chosen along with two other vendors to present its bid to Clarian on July 15, 2008.

After AT & T submitted its bid, Berridge sent Korous an e-mail stating that "[t]he only bidder which provided both functional and upgrade pricing was Bidder # 1 (AT & T) given their long term engagement with the committee." Korous testified that Berridge was referencing how AT & T "knew our solution the most and had the . . . best understanding of our scope of work compared to the other bidders."

On July 10, 2008, Brake asked Huang to endorse AT & T. Brake stated that "[f]urther investigation seems to point to [Berridge] trying to steer this to Electro Evolutions. To my knowledge they have never done a Sim Center and I think it will be a bad result for everyone involved." B–Line responded with the following e-mail for AT & T to include in their presentation:

To the Evaluation Committee:

B–Line Medical has had a good working relationship with AT & T, and looks forward to working with AT & T on many future projects.

AV firms that have working knowledge of B–Line Medical software and hardware technologies are able to reduce the number of issues encountered during an installation.

After the presentation, Brake sent Huang an e-mail stating "thanks for the endorsement. Our presentation went very well. The dynamics in the room were very evident. [Berridge] is pushing for E Evolutions and the rest of the selection committee seems very frustrated that this process was even required." An internal Clarian e-mail dated July 22, 2008, to Berridge explaining a cost-saving measure questioned by Huang that IDS had incorporated into its bid, states that "[t]hese cuts were gained through the meetings with end users.... Bottom line, there is no technical issue with AVS'[s] design vs IDS'[s] design. It simply demonstrates that IDS has had an advantage in the multiple meetings they had with the implementation team."

On August 12, 2008, Korous told another Clarian employee via e-mail that Clarian was "heading in the direction of AVS dependent upon final contract agreement. We are not making a formal announcement until we have the contract signed with them. IDS will not be informed until this time." Brake was notified by Berridge on October 3, 2008, that AT & T and IDS were not awarded the project.

On January 22, 2010, IDS filed a complaint in the circuit

court and filed an amended complaint on June 2, 2010.[10] In both complaints, IDS alleged that B–Line had breached the MSA, citing § 3.1.5. IDS further alleged that B–Line interfered with the contract between Clarian and AT & T, where IDS was a disclosed intended beneficiary of that contract, and that B–Line interfered with economic relations. Following a seven-day trial that began on May 23, 2011, the jury returned a verdict in favor of IDS on all counts, and awarded undifferentiated compensatory damages of $769,422. Judgment in that amount was entered on June 6, 2011.

On June 20, 2011, B–Line filed a Motion to Revise Judgment, a Motion for JNOV, and a Motion for New Trial along with a Motion to Stay Enforcement of the Judgment pending the resolution of the other motions. All motions were denied by the circuit court on July 29, 2011. On August 1, 2011, B–Line noted its appeal to this Court and on August 11, 2011, IDS filed its cross-appeal.

Additional facts will be provided as necessary, in the relevant sections, below.

### Discussion

The case *sub judice* contains both contract and tort claims. B–Line contends that the evidence adduced at trial was legally insufficient to support the jury's verdict. We shall examine each claim in turn.

### I. Standard of Review

This Court recently expressed the applicable standard of review as follows:

> The standard of review of a question of the sufficiency of the evidence is *de novo*. *Polk v. State*, 378 Md. 1, 7–8, 835 A.2d 575 (2003). In a civil case, the evidence is legally sufficient to support a finding in support of the prevailing party if, on the facts adduced at trial viewed most favorably

---

**10.** The original complaint included a count for Breach of Implied Covenant of Good Faith and Fair Dealing that was omitted from the amended complaint.

to that party, any reasonable fact finder could find the existence of the elements of the cause of action by a preponderance of the evidence. *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276 (2005). In a jury trial, the quantum of legally sufficient evidence needed to create a jury question is slight. *Id.* If there is legally sufficient evidence to support a finding in favor of the party bearing the burden of proof, it would be error on the part of the trial judge to grant a motion for judgment in favor of the opposing party and withhold the case from the jury for decision.

The standard of review of a court's denial of a motion for JNOV is the same as the standard of review of a court's denial of a motion for judgment at the close of the evidence, *i.e.,* whether on the evidence presented a reasonable factfinder could find the elements of the cause of action by a preponderance of the evidence. *Washington Metro. Area Transit Autho. v. Djan,* 187 Md.App. 487, 491–92, 979 A.2d 194 (2009). The standard of review of the denial of a motion for new trial is abuse of discretion. *Miller v. State,* 380 Md. 1, 92, 843 A.2d 803 (2004).

*Univ. of Md. Med. Sys. Corp. v. Gholston,* 203 Md.App. 321, 329, 37 A.3d 1074 (2012) (affirming trial court's assessment that evidence was sufficient to present to the jury).

Abuse of discretion has been found:

where no reasonable person would take the view adopted by the trial court, when the court acts without reference to any guiding rules or principles or rules on untenable grounds, and where the ruling does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective.

*Abrishamian v. Barbely,* 188 Md.App. 334, 342, 981 A.2d 797 (2009), *cert. denied,* 412 Md. 255, 987 A.2d 16 (2010) (internal quotations and citation omitted). "We do not disturb a trial court's discretionary ruling simply because we would not have made the same ruling." *Id.* (citing *King v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009)). Further,

[b]ecause the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal.

*Titan Custom Cabinet, Inc. v. Advance Contracting, Inc.*, 178 Md.App. 209, 231, 941 A.2d 547 (2008) (quoting *Buck v. Cam's Broadloom Rugs*, 328 Md. 51, 59, 612 A.2d 1294 (1992)).

## II. Breach of Contract Claim

 The elements of a contract are offer, acceptance, and consideration. *See Peer v. First Fed. Sav. & Loan Ass'n*, 273 Md. 610, 614, 331 A.2d 299 (1975). B–Line argues as to its first question that no contract was formed between itself and IDS pursuant to the MSA, and therefore no breach could have occurred. According to B–Line, in order for a contract to exist between itself and IDS, a purchase order had to be issued by IDS to B–Line, along with an Exhibit A, in connection with the Clarian project. B–Line asserts that because neither a P.O. nor an Exhibit A were issued, no subcontract existed. Further, B–Line argues that IDS had no contractual relationship with Clarian, either directly or as a third-party beneficiary to a contract between AT & T and Clarian, an argument we address in Section III, below.

IDS responds that it was the Prime on the Clarian project because it identified and developed the opportunity before bringing B–Line into it, and that B–Line ignored key provisions in the MSA that create a contract between the parties once they begin to engage in the creation of a Scope of Work document. IDS argues that the MSA only requires a P.O. for payment purposes, not for contract formation purposes, and that an Exhibit A is only required if the parties want to alter the MSA's default payment terms. Moreover, IDS argues that B–Line fails to address the reason why no P.O. was ordered for the Clarian project—because B–Line successfully induced Clarian to remove IDS from the project.

The MSA states, in its first section:

> Whenever either party desires the other party (the "Supplier") provide Services or Material for a client solution (the "Project") for the requesting party (the "Prime"). The Prime will engage resources of Supplier to prepare a "Proposal" and a detailed comprehensive "Scope of Work" letter which will describe the Services to be performed, and any equipment, material, hardware, or software (the "Material") to be provided by Supplier which together with the location(s) at which the Services are to be performed.

The MSA does not call for payment or P.O.s during the preparation of the proposal or Scope of Work document, and in fact requires the Supplier and Prime to each fulfill their respective duties in preparing each at their own expense. Under a separate "Payment" section of the MSA, the Supplier is required to invoice the Prime after services have been provided or products have been shipped. Section 4.3 in the "Payment" section sets a default payment schedule and states "please also refer to Exhibit A for specific pay term." No part of the MSA requires a P.O. or an Exhibit A to be issued in order to create a contract under the MSA. B–Line signed the MSA in March 2006.

B–Line cites *Peoples Drug Stores, Inc. v. Fenton Realty Corp.,* 191 Md. 489, 62 A.2d 273 (1948), in support of its argument that no contract was formed between itself and IDS because of the lack of P.O. and Exhibit A in connection with the Clarian project. B–Line ignores the following language from *Fenton,* however:

> If ... it appears that the parties, although they agreed upon all the terms of the contract, intended to have them reduced to writing and signed before the bargain should be considered complete, neither party will be bound until that is done, **as long as the contract remains without any acts done under it on either side.**

*Id.* at 494, 62 A.2d 273 (citations omitted) (emphasis added). Under *Fenton,* once B–Line and IDS began to act under the terms of the MSA, which as discussed, is not limited to issuing a P.O. or Exhibit A, a contract exists.

The record is replete with evidence, including extensive testimony by Korous and Cook, that IDS offered to bring B–Line into the Clarian project, B–Line agreed to work with IDS on presenting its products as part of a comprehensive solution marketed by AT & T,[11] and that B–Line had consented to IDS acting as Prime on the Clarian project and had begun to work with IDS in the capacity of Supplier by participating in the design work to create the Scope of Work. A reasonable person could find that the conduct of the parties in 2006 and early 2007 indicated the existence of a contract.

B–Line argues that the lack of a P.O. indicates that IDS had only "a general willingness to engage B–Line if IDS received some future purchase order from AT & T" and therefore no contract was formed. In support of this contention, B–Line cites *Md. Supreme Corp. v. Blake Co.*, 279 Md. 531, 369 A.2d 1017 (1977). *Blake* is distinguishable from the case at hand because *Blake* involved the sale of goods and was therefore governed by the Uniform Commercial Code ("UCC"), whereas the contract between IDS and B–Line was mixed, involving services and goods, and the part of the contract performed was for services.

*Blake* is instructive, however, in that the Court of Appeals stated that even under the UCC, a basic principle is that a "contract may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract ... even though the moment of its making is undetermined." *Id.* at 541, 369 A.2d 1017. The *Blake* Court further reasoned that "the conduct of the parties, particularly that of Supreme in delivering concrete and that of Blake in accepting and paying for it, recognized the existence of a contract. There being legally sufficient evidence for the court as the trier of fact to find that Blake accepted Supreme's offer, that judgment on the evidence was not clearly erroneous." *Id.* at 542, 369 A.2d 1017. Similarly,

---

**11.** Section 14 of the MSA states in part that "B–Line appoints [IDS] as an exclusive distributor to SBC Communications, inc. [sic], at & t[sic] and its business affiliates for any B–Line product or Service."

in the instant case, the jury heard testimony that B–Line provided design services before Clarian issued any P.O. to AT & T, in accordance with B–Line's regular practice, and B–Line did not request a P.O. from IDS until after Clarian had paid $160,000 to AT & T and signed the Master Purchase Agreement for the design and implementation stages of the project, when AT & T had a contract for the entire project.

■ The evidence presented by IDS was sufficient to make the issue of existence of a contract between IDS and B–Line a jury question. The record contains sufficient evidence for a reasonable jury to find as it did. Accordingly, the trial court did not err or abuse its discretion in denying B–Line's Motion for Judgment at the close of the evidence, Motion for JNOV, or Motion for a New Trial on the ground of legally insufficient evidence.

## III. Tortious Interference with Contract and Business Relations Claims

### A. Elements of the Claims

■ Maryland follows the principle of *lex loci delicti,* meaning that Maryland courts apply the substantive tort law of the state where the "injury—the last event required to constitute the tort occurred." *Erie Ins. Exch. v. Heffernan,* 399 Md. 598, 620, 925 A.2d 636 (2007). Here, all the conduct related to the tort occurred, with regard to any interaction with Clarian, in Indiana. Therefore, the trial court correctly concluded that Indiana tort law governs the tortious interference claims.

■ Under Indiana law, the elements of tortious interference with contract or business relations are basically the same. Both require 1) the existence of a valid and enforceable contract or business relationship; 2) the defendant's knowledge of the contract or relationship; 3) the defendant's intentional inducement of the breach of contract or interference with the relationship; 4) the absence of justification; and 5) damages resulting from the wrongful interference. *Bragg v.*

*City of Muncie,* 930 N.E.2d 1144, 1147–48 (Ind.Ct.App.2010) (citations omitted); *Geiger & Peters, Inc. v. Berghoff,* 854 N.E.2d 842, 852–53 (Ind.Ct.App.2006) (citations omitted). In order to establish an absence of justification for the interference, a plaintiff must demonstrate that "the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Id.* (citation omitted). Additionally, the tort of interference with business relations requires "some independent illegal action." *Geiger & Peters,* 854 N.E.2d at 853 (citing *Brazauskas v. Ft. Wayne–South Bend Diocese, Inc.,* 796 N.E.2d 286, 291 (Ind.2003)).

B–Line argues in its second question that the elements of the torts were not met because no "valid and enforceable contract" existed between AT & T or IDS and Clarian, IDS had no protected business relationship with Clarian, B–Line's actions were justifiable as pursuing its own legitimate business interests, and B–Line engaged in no illegal conduct.

IDS counters that a valid and enforceable master agreement was in effect between AT & T and Clarian starting in 2004. IDS argues that Clarian awarded the Clarian Simulation Center project to AT & T pursuant to the Master Agreement and memorialized the project in the Master Purchase Acceptance Document and P.O.s issued by Clarian to AT & T. IDS further asserts that it was an intended beneficiary of the contract between AT & T and Clarian. IDS also avers that it had an independent relationship with Clarian in addition to its third-party beneficiary status under the AT & T–Clarian relationship and that "illegal" conduct does not mean "criminal" conduct under Indiana law.

### 1. Existence of Contract Between AT & T and Clarian

First, B–Line maintains that AT & T and Clarian could not reach an agreement on the terms of a contract between them, as evidenced by the unsigned addenda to the Master Agreement, and therefore no contract existed as to the implementation phase of the project. B–Line points to the Master Purchase Acceptance Document dated June 29, 2007, from

Clarian to AT & T, which included the P.O. for the $160,000 retainer fee and hinges its argument on the language stating "[t]his Master Purchase Acceptance Document, including all attachments incorporated herein, constitutes the entire Agreement between the Parties and supersedes all prior negotiations, representations, and agreement, whether oral or in writing related to this purchase." According to B–Line, this document means that the contract between Clarian and AT & T was only for the $160,000 portion of the project. B–Line ignores the fact that the Master Purchase Acceptance Document included the attachment of the Vendor Proposal # 13–062707–2–6, which was AT & T's executive summary of the project and included both the planning and the implementation phases of the project and expressly listed the retainer fee as a ten percent down payment on the total contract price.

Indiana law recognizes that "the nonexistence of a writing is not decisive of whether there was actually a contract; the parties may agree to memorialize their contract in writing at some point in the future." *Eden United, Inc. v. Short,* 573 N.E.2d 920, 926 (Ind.Ct.App.1991) (citing *Int'l Shoe Co. v. Lacy,* 114 Ind.App. 641, 53 N.E.2d 636, 638 (1943)). Therefore, the jury could find, as IDS argued, that the lack of signed addenda to the Master Agreement was of no consequence.

The record shows that IDS presented evidence that this Master Purchase Acceptance Document acknowledged the entire contract between AT & T and Clarian, which was for the entire project, not just the planning phase. Thus, the existence of the contract and the interpretation of this document were factual disputes, properly before the jury, who rejected B–Line's interpretation.

### 2. *IDS as Third–Party Beneficiary to AT & T–Clarian Contract*

Under Indiana law, a third-party beneficiary is one who, "though not a party to a contract, stands to benefit from the contract's performance." *DLZ Ind., LLC v. Greene*

*Cnty.,* 902 N.E.2d 323, 330 n. 4 (Ind.Ct.App.2009) (citation omitted). A party claiming third-party beneficiary status must show 1) a clear intent by the parties to the contract to benefit the third party; 2) a duty imposed on one of the contracting parties in favor of the third party; and 3) performance of the contract terms is necessary for the third-party to receive the direct benefit intended by the parties to the contract. *Haire v. Parker,* 957 N.E.2d 190, 195 (Ind.Ct.App. 2011); *Luhnow v. Horn,* 760 N.E.2d 621, 628 (Ind.Ct.App. 2001).

The record demonstrates that AT & T had an ongoing contractual relationship under its Master Agreement with Clarian. AT & T partnered with IDS, essentially treating IDS as a subsidiary, when selling AV integration solutions. AT & T bid on the Clarian Simulation Center with IDS as its only subcontractor. Under the contract, Clarian was required to use IDS's services and pay AT & T for those services. Clarian had to pay AT & T in order for IDS to be paid under the contract. Extensive testimony was presented explaining the relationship between AT & T and IDS and how Clarian interacted primarily with IDS on the project until Huang and Berridge began communicating. We agree that the jury could reasonably find that AT & T and Clarian intended for the award of the project to benefit IDS pursuant to the AT & T–Clarian Master Agreement.

### 3. *IDS–Clarian Business Relationship*

██ As discussed above, the record contains sufficient evidence to support a jury's finding that a contract existed between AT & T and Clarian. It is undisputed that AT & T and Clarian had an ongoing and longstanding business relationship where AT & T provided network and other information technology services to Clarian. AT & T's Master Agreement with Clarian states that its affiliates and subcontractors are parties to that contract, and the record indicates that AT & T considered IDS to be its exclusive partner for the purposes of the Clarian Simulation Center and other projects requiring AV integration services. Moreover, IDS presented

testimony that it had contracted with Clarian in the past to provide AV solutions for various facilities. Cook testified that IDS was the company that identified the project opportunity, and Huang corroborated that IDS contacted the appropriate Clarian representatives to set up initial meetings, and was the contact point for Clarian representatives regarding the project.

As discussed, sufficient facts exist for the jury to find that both AT & T and IDS had existing relationships with Clarian generally, and specific to the Clarian Simulation Center.

### 4. B–Line's Pursuit of Justifiable Business Interests

B–Line argues that its conduct was nothing more than a pursuit of its own legitimate business interests. B–Line claims that when Clarian contacted it, Clarian was asking questions about a $2,000,000 proposal that B–Line had never seen, and that at all times, B–Line was solely motivated by "a desire to complete a sale of its software to Clarian." IDS argues that B–Line made an internal decision in or about December 2007 to cease working with IDS and then began a secret campaign to remove IDS from the project, while continuing to represent to IDS and AT & T that it was willing to continue working with IDS.

Under Indiana law, a plaintiff "must show that the defendant acted exclusively to harm the plaintiff['s] business interest." *Smith v. Biomet, Inc.,* 384 F.Supp.2d 1241, 1249 (N.D.Ind.2005) (citation omitted). The record contains ample evidence supporting IDS's argument. IDS presented testimony that it worked with B–Line prior to and immediately after the November 2006 meeting to create three scenarios, offering "good, better, and best solutions" ranging in price from $1.5 million to $3.5 million. On January 19, 2007, AT & T presented its bid for the Clarian Simulation Center, explaining that it was teaming with IDS and offering B–Line's products as part of its comprehensive package. The testimony demonstrated that IDS and B–Line continued to work closely to refine the pricing and design throughout 2007. In February 2007, Cook

notified B–Line that AT & T/IDS had been awarded the project. Huang admitted to signing off on the Scope of Work submitted to Clarian in September 2007. Therefore, the record contains evidence refuting B–Line's claim that it was unaware of a contract or of any contract pricing.

After circulating the internal e-mail expressing the desire to remove itself as subcontractor to IDS on the Clarian Simulation Center project in December 2007, B–Line then submitted proposals to Clarian to situate itself as the Prime on the project, adding the benefit of a five percent fee on top of the price for its software, and initiated a bid process to select a new AV integrator for the project. B–Line argues that this conduct was not "exclusively directed" to the injury of IDS. However, IDS also presented evidence that B–Line, in the course of soliciting bids for an AV integrator, provided confidential and proprietary information belonging to IDS to other AV companies. The conduct does not have to be "exclusively directed" in order to fail the test for justifiable conduct.

In determining whether conduct was justifiable, Indiana courts have stated that "the overriding question is whether the defendant's conduct has been fair and reasonable under the circumstances." *Bilimoria Computer Sys., LLC v. Am. Online, Inc.,* 829 N.E.2d 150, 156 (Ind.Ct.App.2005) (citing *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 759 N.E.2d 239, 252 (Ind.Ct.App.2001)). Indiana courts have found substantial justification for competition where a party seeks only to sell its product to potential customers. *See e.g. Economation, Inc. v. Automated Conveyor Sys. Inc.,* 694 F.Supp. 553 (S.D.Ind.1988) (competition is a legitimate business interest). Some Indiana courts have adopted the RESTATEMENT (SECOND) OF TORTS § 768 (1977), which states in part:

§ 768 Competition as Proper or Improper Interference

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if[:]

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint on trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Comments b and e to § 768 state:

One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services.

*See Rice v. Hulsey,* 829 N.E.2d 87, 91 (Ind.Ct.App.2005); *Computers Unlimited, Inc. v. Midwest Data Syss., Inc.,* 657 N.E.2d 165, 169 (Ind.Ct.App.1995).

▬ The case *sub judice* is distinguishable from those involving competitors. B–Line, as a Supplier to IDS, already had a contracted sale of its product to Clarian. B–Line was not competing with another software manufacturer; in fact, as part of its November 2006 and January 2007 presentations with IDS, it successfully eliminated a potential software competitor from Clarian's consideration. B–Line presented itself as part of the AT & T/IDS team package. Nevertheless, B–Line convinced Berridge that contracting separately with B–Line and an AV integrator was a necessary change. The record contains sufficient evidence to generate a factual dispute regarding B–Line's motive and intent in engaging directly with Clarian and a determination of the reasonableness of B–Line's actions under all the circumstances lies squarely with the fact-finder.

### 5. Illegal Conduct

 Under Indiana law, to satisfy the fourth prong of the test for intentional interference with business relations, B–Line must have engaged in illegal conduct. However, illegal does not equate to criminal conduct but instead has been "interpreted loosely ... encompassing a broad swath of claims." *Nikish Software Corp. v. Manatron, Inc.*, 801 F.Supp.2d 791, 797 (S.D.Ind.2011) (citing *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir.1999)). The courts, applying the RESTATEMENT (SECOND) OF TORTS § 768 (1977) standard, *supra*, have held that if "wrongful means" are employed in the interference, there can be no justification. *Rice*, 829 N.E.2d at 91. This contradicts other cases holding that the existence of any legitimate business interest will suffice as justification. *See e.g. Bilimoria*, 829 N.E.2d at 157. Wrongful means require some showing of fraud, deceit, intentional misrepresentation, deliberate disparagement, or similar conduct. *See generally*, Prosser, *Torts* § 130, at 956 (4th ed. 1971).

 At trial, IDS presented testimony and documentary evidence that B–Line made an internal decision to cease working with IDS, failed to notify IDS of that decision, and continued to work with IDS on designs for Clarian, while simultaneously engaging in discussions with Berridge about B–Line taking control of the project and selecting a new AV integrator. B–Line intentionally misrepresented to IDS that it was not communicating with Berridge and was "staying out of the matter out of respect for the partnership." Meanwhile, B–Line represented to Berridge that it had not been part of the design process, tried to ensure that Berridge would not disclose B–Line's negotiations to assume the role of Prime to IDS, used IDS work product and proprietary pricing and equipment lists in its preparation of the bid package submitted to other AV integrators, and did not solicit bids from IDS, despite B–Line's argument that it was willing to work with "any qualified AV integrator, including IDS, to sell its software to Clarian." We agree that the record contains sufficient

evidence to submit the issue of wrongful or illegal conduct to the jury and for the jury to find in favor of IDS.

## IV. Jury Instructions Regarding Third-Party Beneficiary Status

Underlying each of these arguments, B–Line argues that the trial court erred in giving the jury instructions regarding third-party beneficiary status because, under Indiana law, a third-party beneficiary to a contract, like IDS was to any AT & T and Clarian contract (assuming one existed), cannot recover under either tort claim asserted. IDS avers that B–Line did not preserve this issue of erroneous jury instructions for appellate review. Alternatively, IDS contends that, even if preserved for review, the trial court did not err.

First, we must address IDS's claim that B–Line failed to preserve the issue for appeal. Maryland Rule 2–520(e) states in pertinent part that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter which the party objects and the grounds of the objection." *See Mayor & City Council v. Hart,* 167 Md.App. 106, 124, 891 A.2d 1134 (2006); *Hoffman,* 385 Md. at 39–40, 867 A.2d 276. Maryland Rule 2–520(e) has been interpreted "as requiring parties to be precise in stating objections to jury instructions at trial, for the plain reason that the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection." *Fearnow v. Chesapeake & Potomac Tel. Co.,* 342 Md. 363, 377–78, 676 A.2d 65 (1996) (citations omitted). Generally, a mere reference "to the written prayer by number . . . [will be] held . . . to be insufficient compliance with the requirement [of Rule 2–520(e) ] that the trial judge's alleged failure to give any instruction be stated 'distinctly' together with the 'ground' of any objection thereto." *Sergeant Co. v. Pickett,* 283 Md. 284, 288, 388 A.2d 543 (1978) (referencing *Belt's Wharf Warehouses, Inc. v. Int'l Prods. Corp.,* 213 Md. 585, 591–92, 132 A.2d 588 (1957)).

The trial transcript reflects that when the trial judge asked if there were any objections to the instructions, one counsel for B–Line, Mr. Bolton, stated "No, your Honor." Then, after counsel for IDS noted several objections, another counsel for B–Line, Mr. Campsen, stated:

> Your Honor, we object to—we object to using the plaintiff's verdict sheet. We object to the use of plaintiff's willful interference with the contract, plaintiff's interference with business relations between IDS and Clarian Health. These are 29, 30, 31, and 32, they were written in that order. And then interference with business relations between AT & T and Clarian Health. And then plaintiff's absence of justification. Defendant's—the denial of independent contractor instruction, denial of parole evidence instruction, denial of contracts restricting competition instruction and the consequential damage instruction, because they didn't plead any.
>
> And then also, Your Honor, one other matter, we'd agreed to add in Maryland Pattern Jury Instruction 9–17 on the statute of frauds.
>
> \* \* \*
>
> Well, I'll object to not using the statute of fraud instruction.

None of the objections in the transcript gives any specific reason for the objection or directs the trial judge to Indiana law prohibiting considering third-party beneficiary status in the torts. As discussed, generic objections are insufficient to preserve the issue for appeal. B–Line argues in its rebuttal brief that it provided the argument for omitting all third-party beneficiary language, both during trial and in written form, as footnotes to its proposed jury instructions. Our review of the record shows that B–Line raised the issue of whether Indiana law allows third-party beneficiaries to a contract to recover under the torts alleged during its argument in support of its motion for judgment at the close of IDS's case at trial. The trial judge noted the citation to *Eden*, 573 N.E.2d 920, and IDS argued for a different reading of *Eden* than that espoused by B–Line.

While it is true that "under certain well-defined circumstances, when the objection is clearly made before instructions are given, and restating the objection after the instructions would obviously be a futile or useless act, we will excuse the absence of literal compliance with the requirements of the Rule[,] . . . these occasions represent the rare exceptions, and . . . the requirements of the Rule should be followed closely." *Haney v. Gregory,* 177 Md.App. 504, 518, 936 A.2d 388 (quoting *Sims v. State,* 319 Md. 540, 549, 573 A.2d 1317 (1990)). We agree with B–Line that the trial court understood the reason for their objection and further explanation was unnecessary to preserve the issue for appellate review.

Having determined that the issue of erroneous jury instructions was preserved for our review, we now consider whether the instructions given by the trial judge were erroneous or if denial of certain instructions was an abuse of discretion. The Court of Appeals has held that:

> [T]he standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them. If, however, the instructions are ambiguous, misleading[,] or confusing to jurors, those instructions will result in reversal and a remand for a new trial. On the other hand, the instructions must be read in context. The charge to the jury must be considered as a whole and the Court will not condemn a charge because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other.

*Smith v. State,* 403 Md. 659, 663–64, 944 A.2d 505 (2008) (internal citations and quotations omitted). When we review a trial court's grant or denial of a requested jury instruction, we review under the abuse of discretion standard, keeping in mind:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbi-

trarily or capriciously. Where the decision or order [of the trial court] is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Bazzle v. State*, 426 Md. 541, 549, 45 A.3d 166 (2012) (citation omitted). In evaluating the trial court's decision, "we consider whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *Malik v. Tommy's Auto Serv., Inc.,* 199 Md.App. 610, 616, 24 A.3d 114 (2011) (citations omitted); *see also Landon v. Zorn,* 389 Md. 206, 224–25, 884 A.2d 142 (2005).

The trial court gave the jury the following instructions regarding contracts and third party beneficiaries:

Contracts can be express contracts, oral or written. An express contract is an agreement of the parties that is oral or written. An implied contract . . . is an agreement created by conduct indicating the intention of the parties to make an agreement. A contract may be entered into by parties who are not in the physical presence of each other at the time of contracting. The offer and the acceptance may be made while they are communicating with each other by any means and the contract which results is as binding as a contract entered into in a more formal manner.

For an agreement to be binding it must involve consideration. Consideration can be anything of value to the other contracting party. No particular or formal words are needed to make a contract. Each party must have understood and agreed to all terms and conditions. This agreement may be demonstrated in writing, orally or may be shown by conduct of the parties.

A material breach by one party relieves the other party from the duty of performance. A breach is material if it affects the purpose of the contract in an important or vital

way. In order to be a third party beneficiary of a contract, the following requirements must be satisfied. One, the intent to benefit the third party must be clear. Two, the contract must impose a duty on one of the contracting parties in favor of the third party. And, three, the performance of the terms must necessarily render to the third party a direct benefit intended by the parties to the contract. It is not enough that performance of a contract would indirectly benefit a third party. The controlling factor is whether the contracting parties intended the contract to benefit a third party and this intent must clearly appear in the terms of the contract.

* * *

To recover damages for wrongful interference with the business relationship between Interactive Digital Solutions and Clarian Health Partners, plaintiff Interactive Digital Solutions must prove by the greater weight of the evidence that, one, a business relationship existed between plaintiff, Interactive Digital Solutions and Clarian Health Partners, Inc.; two, that defendant, B–Line Medical knew of the business relationship; three, that defendant, B–Line Medical intentionally interfered with the business relationship; four, that no justification existed for defendant, B–Line Medical's conduct; five, that defendant, B–Line Medical, acted illegally in achieving defendant's end; and six, that plaintiff, Interactive Digital Solutions, was damaged as a result.

To recover damages for wrongful interference with contractual relations, plaintiff, Interactive Digital Solutions, must prove by the greater weight of the evidence that, one; a valid and enforceable contract existed between AT & T and Clarian Health Partners, Inc.; two, that plaintiff, Interactive Digital Solutions, was a third party beneficiary of the contract that existed between AT & T and Clarian Health [Partners], three, that defendant, B–Line Medical knew the contract between AT & T and Clarian Health Partners existed; four, that the defendant, B–Line Medical intentionally caused a breach of the contract; five, no justification

existed for B–Line Medical's conduct; and six, plaintiff, Interactive Digital Solutions, was damaged as a result.

To recover damages for wrongful interference with the business relationship between AT & T and Clarian Health Partners, plaintiff, Interactive Digital Solutions must prove by the greater weight of the evidence that, one, a business relationship existed between AT & T and Clarian Health Partners, Inc.; two, plaintiff, Interactive Digital Solutions was a third party beneficiary of the business relationship that existed between AT & T and Clarian Health Partners; three, that defendant, B–Line Medical knew of the business relationship; four, that defendant, B–Line Medical intentionally interfered with the business relationship; five, that no justification existed for defendant, B–Line Medical's conduct; six, defendant, B–Line Medical acted illegally in achieving defendant's end; and seven, plaintiff's—plaintiff, Interactive Digital Solutions, was damaged as a result.

B–Line's proposed jury instructions were the same as above regarding the tort claims, except all mention of third-party beneficiary status was omitted from the instructions for tortious interference with contract and business relations.

## A. Denial of Instruction on Contracts Restricting Trade

B–Line argues that the trial court erred because it failed to give the jury B–Line's requested instruction "regarding the narrow interpretation of provisions restricting trade and competition under Maryland law." Citing *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 752–53, 929 A.2d 932 (2007), the denied instruction read as follows:

Contracts that purport to prohibit or restrict competition are disfavored in the law and are to be narrowly construed. In other words, contract provisions that restrict competition should not be broadly interpreted to restrict competition beyond the plain terms of the contract. Rather, provisions restricting competition must be narrowly interpreted.

Section 3.1.5 is a subsection of the "General Terms and Conditions" section of the MSA which lists what the parties

agree to "in consideration of the mutual agreements set forth." Section 3.1.5 states that "Supplier shall not provide any service directly to a client for solutions provided as a subcontractor to the Prime without written authorization from the Prime." In its brief, B–Line contends that the past tense language used in the contract provision requires a contract between the parties, which it argues never existed.

IDS responds that no evidence was presented that § 3.1.5 significantly restrained competition, and therefore the denial of the instruction was within the court's discretion and, if in error, was harmless. B–Line does not direct us to any evidence in the record regarding restraint on competition, and we are unclear as to why B–Line requested this instruction, unless to support its argument that no breach of contract occurred on the grounds that § 3.1.5 is unenforceable under *Diamond Point.*[12]

The record indicates that the trial court instructed the parties thoroughly on contract formation and breach. Further, we agree with IDS that the instruction regarding restriction of trade is not supported by the evidence. The court's failure to provide the requested instruction did not affect the jury's ability to find whether a contract existed between the parties. The party complaining about the trial court's denial of a requested instruction "must not only establish error, but also show prejudice resulting from that error." *Malik,* 199 Md.App. at 617–18, 24 A.3d 114 (citing *Landon,* 389 Md. at 225, 884 A.2d 142). Finding neither error nor prejudice, we hold that the trial court did not abuse its discretion in denying the requested instruction.

---

**12.** The contract provision at issue in *Diamond Point* involved the timing of the operation of retail operations by Wal–Mart within a particular geographic radius. The crux of the question was if Wal–Mart could open and operate stores within the geographical area while other of its own stores were concurrently operating, or if it was also precluded from opening a new store within the geographical area when a store had ceased operation but the property where the defunct store had been located was still being leased by Wal–Mart and sublet for non-retail purposes.

### B. Denial of Instruction on the Indiana Statute of Frauds

The Indiana Statute of Frauds states that a person cannot bring "an action involving any agreement that is not to be performed within one (1) year from the making of the agreement" unless the contract on which the action is based is in writing. *Coca–Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557, 561 (Ind.2006) (citing Ind.Code § 32–21–1–1(b)). As discussed, the Master Agreement was in effect between AT & T and Clarian, and testimony established that while the addenda were desired, they were not required to create contractual obligations between AT & T and Clarian for the Clarian Simulation Center. Therefore, the requested instruction on the Indiana Statute of Frauds was not supported by the evidence and the trial court did not abuse its discretion by denying the instruction.

### C. Instructions On Third–Party Beneficiaries

B–Line argues that the trial court incorrectly instructed the jury on Indiana law, which, it argues, does not recognize claims by a third-party for tortious interference with contract or business relations. IDS, while acknowledging that Indiana courts have not directly addressed the issue, counters that Indiana courts have indicated that if confronted with the issue, they would adopt the position of the RESTATEMENT (SECOND) OF TORTS, § 766, cmt. p (1979). In support of their respective arguments, both parties cite to *Eden*, 573 N.E.2d 920.

*Eden* involved a contractual arrangement as convoluted as the one before us, which we will endeavor to describe succinctly. In *Eden*, a Los Angeles real estate syndicator retained Frank Short as an intermediary to facilitate the purchase of an apartment complex in Indianapolis, Indiana. The property was marketed by Scott Kranz, who represented himself as Vice–President of the I.R.E. Group. However, neither the I.R.E. Group nor Eden United, Inc. ("Eden United") owned the property. The Chatlee Realty Co. ("Chatlee") actually owned the property and was negotiating with Eden United for

its sale. A deal was struck where Eden United would purchase the property from Chatlee and then sell it to Short. Various misrepresentations were made by Eden United to Short regarding the status of mortgages in the early stages of contract negotiations. Eden United failed to fulfill its obligations on its contract with Chatlee for months, and when Short questioned Eden United about the delay, Eden United proposed to change its contract with Short. The proposed contract contained provisions that were unacceptable to Short as well as financially untenable, but Eden United and Short were ultimately able to renegotiate acceptable terms.

When it came time to close on the property, Eden United provided Short with documents that reflected its proposed agreement rather than the terms actually agreed upon by the parties. Nevertheless, Short attempted to resolve the issues during closing but Eden United refused to cooperate and aborted the closing. Eden United then defaulted on its escrow arrangements with Chatlee, allowing Chatlee to proceed to closing directly with Short, pursuant to the first agreement between the three parties. Eden United thereafter acted to block that closing and induce Chatlee to sell the property to any purchaser other than Short. No sale was ever consummated between Short and Chatlee. Short then prevailed on an action for breach of contract and tortious interference with contractual relations. On appeal, Eden United argued that Short did not have standing to assert the tort cause of action as a third-party beneficiary to a contract. *Id.* at 922–24.

The *Eden* Court did not find that Short was a third-party beneficiary to the Eden–Chatlee contract, but rather, that Short had "a direct contractual right to close with Chatlee under the terms of the Short–Eden Contract." *Id.* at 924. In a footnote explaining why the case cited by Eden United did not apply, the Court stated:

> Although Indiana law holds that a plaintiff must be a party to the contract with which he alleges tortious interference, we are not aware of any Indiana decisions addressing the standing of a third-party beneficiary who suffers harm as a

consequence of tortious conduct directed at a contract's third-party beneficiaries. *Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad,* 579 F.Supp. 574 [ (1983) ], relied upon by *Eden* in support of its standing position, cites the Restatement (Second) of Torts, comment p as authority for its holding that to obtain protection, the plaintiff must be a party to the contract. Comment p explains that the person protected by the rule is the specified person with whom the third person had a contract and persons other than a party to the contract who are harmed by the defendant's actions if the defendant intends to affect them. Since the evidence shows that Eden's tortious conduct was intentionally directed at Short, were we to conclude that Short was solely a third-party beneficiary of the Eden–Chatlee contract, we might be inclined to follow the spirit of the Restatement rather than *Organization of Minority Vendors,* as other jurisdictions have.

*Id.* at 925 n. 2 (emphasis omitted).

The Restatement (Second) of Torts, § 766, cmt. p (1979) states:

*p. The person protected.* The person protected by the rule stated in this Section is the specified person with whom the third person had a contract that the actor caused him not to perform. To subject the actor to liability under this rule, his conduct must be intended to affect the contract of a specific person. It is not enough that one has been prevented from obtaining performance of a contract as a result of the actor's conduct (Cf. § 766A).

Thus, if A induced B to break a contract with C, persons other than C who may be harmed by the action as, for example, his employees or suppliers, are not within the scope of the protection afforded by this rule, unless A intends to affect them. Even then they may not be able to recover unless A acted for the purpose of interfering with their contracts. (See § 767, Comment *h).* The rule does not require, however, that the person who loses the performance of the contract as a result of the conduct of the actor should be specifically mentioned by name. It is

sufficient that he is identified in some manner,—that he is the person intended by the actor and understood by those whom the actor seeks to induce.

* * *

In some cases the expression of one's general opinions or advice may cause persons not to perform their contracts with another. Thus a prominent person's opinion that economic opportunities are greater in the West than in the East and his advice to young men in general that they "go West" may cause some [young] man to leave an existing employment in breach of his contract and seek new fortune in the West.... Only when the actor's conduct is intended to affect a specific person is the actor subject to liability under this rule.

The *Eden* Court then adopted the view of the Restatement (Second) in its affirmation of the trial court's ruling on the breach of contract claim. The Court stated:

The Restatement (Second) of Torts § 766 would subject the interferer to liability if he induces or otherwise causes the other party "not to perform" without regard to that party's ability to avoid liability for breach, reasoning that a contract is a valid and subsisting relation until it is avoided. Restatement § 766, comment f. *See also* 45 Am.Jur.2d Interference § 41 (Tort includes not merely procurement of breach but all invasions of contractual relations including any act which retards, makes more difficult, or prevents performance, or makes performance of contract less valuable to promisee)[.]

573 N.E.2d at 925. Additionally, other jurisdictions in the same Federal Circuit have cited to the Restatement (Second) in holding that "the tort of intentional interference with contract is meant to protect the parties (including third-party beneficiaries, assignees, and others having the rights of parties) to contracts." *CSY Liquidating Corp. v. Harris Trust & Sav. Bank*, 162 F.3d 929, 932–33 (7th Cir.1998) (citations omitted).

■ We agree with IDS, and case law demonstrates, that Indiana courts follow the Restatement (Second) of Torts. Therefore, the jury instructions given for the intentional torts were accurate statements of the law and, as discussed above, were applicable in light of the evidence before the jury. Contrary to B–Line's assertions that the AT & T–Clarian Master Agreement confers no rights on IDS as a third-party, the record shows that the Master Agreement stated that AT & T subcontractors were in the position of AT & T and thus, had the same rights as parties to the contract. We, therefore, hold that the trial court did not err or abuse its discretion in giving jury instructions indicating that IDS could recover in tort as a third-party beneficiary to any contract between AT & T and Clarian.

**JUDGMENT OF THE CIRCUIT COURT FOR HOW-ARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**